No. 68,067

STATE OF KANSAS, *Appellee*, v. ACE D. CRAWFORD, *Appellant*.

(861 P.2d 791)

Opinion filed October 29, 1993.

*Jean K. Gilles Phillips*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Jo Ann Van Meter*, assistant district attorney, argued the cause, and *Joan M. Hamilton*, district attorney, and *Robert T. Stephan*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a direct appeal by Ace Crawford of his jury convictions of seven counts of aggravated robbery, two counts of aggravated battery, two counts of kidnapping, and four counts of aggravated burglary. He was sentenced to a controlling term of 60 years to life in prison.

Crawford testified that, on February 17, 1991, he traveled from Kansas City to Topeka with Larry Bateman and Bateman's girlfriend. Crawford owed money to Bateman for cocaine which Bateman had supplied to him. Bateman wanted Crawford to commit some robberies in Topeka in order to get money. During the drive, Bateman's girlfriend gave a gun to Crawford. In Topeka they first stopped at the Ramada Inn.

Leaving the Ramada Inn, Bateman drove Crawford to Parkview Hospital. Crawford testified that when Nancy Jo Overholt came out of the hospital, Bateman told him to rob her. As Overholt was putting her seat belt on, Crawford approached her and pointed the gun at her. She grabbed the barrel of the gun, and the two struggled. Crawford pulled the gun from her grasp and hit her with the butt of it. She gave him her wedding rings, and, when she could not get her other ring off, Crawford hit her again with the butt of the gun.

When Crawford walked away from her, Overholt stood and yelled to an approaching man, telling him to run because Crawford had a gun. Overholt's head wounds required sutures, she suffered a concussion, and she spent three days in the hospital.

Crawford approached Mark Monhollon, the man Overholt tried to warn, put the gun in Monhollon's ribs, and told him it was a big gun which would "put a big hole in a big man." At gunpoint, Monhollon got into the driver's seat of his car, and Crawford got in behind him. As Monhollon drove, Crawford kept the gun pressed in Monhollon's side and took Monhollon's wallet and checkbook out of his pockets. Seeing Monhollon's address on his checks, Crawford told him to drive to his residence.

. Once inside Monhollon's duplex, Crawford made Monhollon lie face down on the floor, then crawl into the next room where Crawford took Monhollon's ring and the cash from his pockets. While Monhollon was forced to crawl along on the floor, Crawford went from room to room opening storage areas and drawers and pulling or dumping out the contents. Crawford pulled pictures off the walls, tore up photographs, and ripped up the beds.

Crawford changed into Monhollon's clothes and shoes. He ate and drank Monhollon's food and soft drinks. When Crawford made a telephone call, Monhollon heard him say "Steven" or ";Stevenson" and "I have transportation." Then Crawford began asking Monhollon about his friends and neighbors as possible sources for another car and valuables.

At gunpoint, Crawford took Monhollon to the back door of the other half of his duplex and instructed him to say his phone was not working. Monhollon's neighbor, Bernice Looka, let him in and Crawford followed him. In the bedroom, Crawford went through Looka's jewelry and dresser drawers. Then Crawford told Looka to take off her clothes and he handcuffed her to the faucet in the bathroom. He made Monhollon wait while he ate Looka's ice cream and cookies.

At gunpoint, Crawford took Monhollon back to his half of the duplex. Crawford went through Monhollon's house a second time, gathering up items he had passed over the first time. Crawford made Monhollon load things into the car and get into the passenger seat.

With Crawford driving, they set out to find an automatic bank teller machine where Crawford could use the bank card he had taken from Monhollon's wallet. Crawford made Monhollon ride on the floor. Crawford then pulled into a residential driveway and said to Monhollon, "We'll walk in here like we own the place."

After they got inside, the homeowner, Nancy Kinney, who had been outside, came into her garage. Crawford pointed the gun at her. When Kinney screamed and tried to run away, Crawford struck her with the gun, and she lost consciousness. When she regained consciousness, Crawford put the gun in her back and forced her into the house where she saw Monhollon lying face down on the floor. Crawford went through the house, looking

for money, jewelry, and guns. Kinney got into her purse to get money for Crawford. Crawford then took Kinney to the basement and told her to count to a thousand before coming up.

Crawford told Monhollon to carry the television out to the car. Monhollon got back on the floor of the car, and they drove to an automatic teller machine. With the gun pointed at Monhollon, Crawford gave him the bank card and told him to withdraw his money. Monhollon gave Crawford the money, they drove to what Monhollon believed was the Ramada Inn, and Crawford put Monhollon in the trunk of the car.

Crawford got out of the car to make a phone call, and he warned Monhollon not to do anything. After Crawford returned to the car, Monhollon heard another car drive up, some discussion, and a car drive off. Crawford drove to Lawrence with Monhollon in the trunk. Upon arriving in Lawrence, Crawford stopped at the Holidome. According to Crawford, Bateman was not satisfied with the evening's take and threatened to hurt him and his son if he did not get more. Crawford testified that Bateman instructed him to wait until after midnight and then rob the Holidome. Quite a long time passed while Monhollon remained in the trunk, the car was moved, and the car doors were opened and closed.

After it got quiet around the car, Monhollon kicked the back seat forward so that he could crawl into the interior of the car. He was alone, the keys were in the seat, and he drove from the Holidome parking lot in Lawrence to the turnpike entrance where he told a police officer what had happened.

Lawrence police officers found Crawford underneath a table in the restaurant of the Holidome. Items taken from Crawford by the police included a loaded semiautomatic pistol, a piece of rock cocaine, a glass pipe, some cigarette lighters, and a Holidome room key.

Crawford was interviewed at the Lawrence Law Enforcement Center by Officer Fox of the Topeka Police Department. Officer Fox read the *Miranda* warning to Crawford, who indicated that he understood his rights and waived them. Crawford asked if there was some kind of deal he could work out with the police. When he was told that there would be no deal, Crawford told the police about his activities in Topeka earlier that day.

He told the police that he had gone to Topeka with Bateman so that he could get money to buy cocaine from Bateman. He told police that Bateman had given him the gun. Crawford told police that after he had robbed Overholt, Monhollon, Looka, and Kinney, he met Bateman at the Ramada Inn in Topeka and exchanged the money and jewelry for cocaine. Crawford did not mention owing a large amount of money to Bateman, he did not indicate that he feared Bateman, nor did he indicate that he was forced by Bateman to commit the robberies.

At trial, Crawford testified that when he first began using crack cocaine, he bought it from Bateman. During the months immediately before the occurrences at issue, Bateman informed Crawford that he owed $6,000 and then $10,000 for crack cocaine he had gotten on credit. When Bateman began pressuring him, Crawford went to another supplier. Crawford testified that Bateman and some cronies learned that he had gone to another supplier and threatened him; Crawford believed that Bateman was going to kill him.

After his arrest, Crawford told police that he lived at the Riverview Project in Kansas City. At trial, Crawford testified that he lived in a crack house which Bateman operated and that he was not free to come and go as he pleased. Crawford denied being one of Bateman's "workers," but he stated that "until I could pay him his money off I had to do what he asked me to do," including committing crimes. Crawford testified that Bateman "had me doing a lot of crimes in Kansas City."

When asked on direct examination about how and why he moved into the crack house, Crawford gave the following answer:

"So he got to telling me about I know that he's a member of the Moorish Americans and I know that the type of individuals that he was speaking of were some dangerous people and that it wouldn't be nothing for him to call down there to his friends where my son and mother, the store that she works for and have somebody to set her up while the Ace is with her and possibly burn them up in the house or shoot and kill them."

Crawford testified that Bateman knew about Crawford's son because "he's originally from St. Louis and he knows Anthony Bradley, whom my son's mother works for."

Crawford testified that the Moorish Americans were a religious group who had a branch that "was basically just involved in drug

warfare and selling dope and hurting people and stuff like that."
Crawford described an instance of revenge killing which he had
heard about. Then he was asked the following question and gave
the following answer:

"Q. Now your knowledge of the St. Louis Moorish American sects have
any influence to you as to whether Larry Bateman could in fact hurt your
son?

"A. Yes, he could, because he was friends with some members down
there, the Moor Sciences Temple of America that are still down there, could
go do the same thing, driving Cadillacs, got a lot of money."

He gave the following explanation for not going to the police in
these circumstances:

"A. I just didn't feel that they would believe me with the shape that I
was in, and plus I was a junky. And if they didn't believe me or something
and Bateman or somebody found out and get word back to him or something
then I didn't have no type of security whatsoever over my son.

"Q. What type of security did you have over your son when you were
with Bateman?

"A. Because as long as I was doing what he asked and trying to pay him
his money that I owed him he wasn't going to do nothing to me or my
son."

Officer Fox testified that when he was questioning Bateman's
girlfriend in her Kansas City apartment a few days after the
occurrences, Crawford telephoned her. Officer Fox heard Craw-
ford tell her that he had not told the police anything and that,
if they were in Kansas City, they were just fishing. At trial, when
Crawford was asked why he made the telephone call, he said
that he did not think that Bateman had been arrested, that he
was unable to call St. Louis to check on his son's well-being, and
that the call to the girlfriend was intended to pacify Bateman "so
he wouldn't do nothing to him."

At trial, Dr. Gilbert Roland Parks, a psychiatrist, testified on
behalf of Crawford. Dr. Parks testified that Crawford suffered
from chronic drug dependence and use, chronic depression, bat-
tered person syndrome and depression arising from it, and an
extremely dependent personality disorder. He was of the opinion
that Crawford committed the crimes at issue "under the fear" of
Bateman.

The first issue asserted on appeal by Crawford is that the district court's instruction on compulsion was erroneous. K.S.A. 21-3209 provides:

"(1) A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believes that death or great bodily harm will be inflicted upon him or upon his spouse, parent, child, brother or sister if he does not perform such conduct.

"(2) The defense provided by this section is not available to one who willfully or wantonly places himself in a situation in which it is probable that he will be subjected to compulsion or threat."

PIK Crim. 2d 54.13 tracks the statute:

"Compulsion is a defense if the defendant acted under the compulsion or threat of imminent infliction of death or great bodily harm, and he reasonably believed that death or great bodily harm would have been inflicted upon him or upon his [parent] [spouse] [child] [brother] [sister] had he not acted as he did.

"(Such a defense is not available to one who willfully or wantonly placed himself in a situation in which it was probable that he would have been subjected to compulsion or threat.)"

In the present case, the district court instructed the jurors as follows:

"It is a defense to the charges made against the defendant if he acted under the compulsion or threat of imminent infliction of death or great bodily harm, and he reasonably believed that death or great bodily harm would have been inflicted upon him or upon his child had he not acted as he did.

"Such a defense is not available to one who willfully or wantonly placed himself in a situation in which it was probable that he would have been subjected to compulsion or threat.

"The compulsion or coercion which will excuse the commission of a criminal act must be present, imminent and impending and of such a nature as to induce a well-grounded apprehension of death or serious bodily harm if the act is not done; it must be continuous, and there must be no reasonable opportunity to escape the compulsion without committing the crime. A threat of future injury is not enough, particularly after danger from the threat has passed."

Crawford complains of the district court's addition of the third paragraph, in particular the last sentence. Trial counsel, however, did not object to it. The limitation on appellate review of an

instruction to which objection was not made was clearly stated in *State v. Wilson*, 247 Kan. 87, 94, 795 P.2d 336 (1990):

"No party may assign as error the giving or failure to give an instruction unless, before the jury retires to consider its verdict, an objection stating the specific grounds is entered. Absent such objection, this court's review is limited to a determination of whether the instruction was clearly erroneous. K.S.A. 22-3414(3). An instruction is clearly erroneous when a reviewing court reaches a firm conviction that, if the trial error had not occurred, there was a real possibility that the jury would have returned a different verdict. *State v. Patterson*, 243 Kan. 262, 268, 755 P.2d 551 (1988)."

Crawford argues that there is a real possibility that the jurors would have concluded that he was not guilty due to compulsion had they been correctly instructed. His argument is that, when the legislature used the word "imminent," it was not disallowing the threat of future infliction of death or harm as a defense. He contends that cases such as *State v. Myers*, 233 Kan. 611, 664 P.2d 834 (1983), and *State v. Harrison*, 228 Kan. 558, 618 P.2d 827 (1980), which disallow the threat of future harm as a defense are not controlling in the present case where compulsion is not due to the physical presence at the crime scene of a threatening person. He urges that the view of compulsion which prevailed in *United States v. Contento-Pachon*, 723 F.2d 691 (9th Cir. 1984), be applied in the circumstances of the present case. He likens that view to the one which this court has taken in adopting the battered person syndrome as a defense in *State v. Hodges*, 239 Kan. 63, 716 P.2d 563 (1986).

The State contends that the language which the district court added to the PIK model was approved in *Harrison*, 228 Kan. at 560, where *State v. Milum*, 213 Kan. 581, 516 P.2d 984 (1973), was cited. The State argues that, in any event, the evidence which is relevant to compulsion is extremely thin. Finally, the State relies on *State v. Crabtree*, 248 Kan. 33, 805 P.2d 1 (1991), in contending that the battered person syndrome defense is not available to Crawford.

We conclude that, under established Kansas case law, the instruction given by the district court was a correct statement of the law on the defense of compulsion. Further, the circumstances of previous Kansas cases are not limited, as Crawford suggests,

to crimes being committed while a gun was being held to the defendant's head or a knife to his ribs.

In *Harrison,* the court referred to *Milum* as "[t]he leading Kansas case on the defense of compulsion." 228 Kan. at 560. Milum escaped from the Kansas State Penitentiary. The district court refused, on the ground of relevance, to admit his proffered evidence that the deputy warden, on several occasions and in the presence of witnesses, told Milum that he " ' "had better run off or I will have you shot." ' " 213 Kan. at 583. The court noted that the alleged threats were made in June or July and that Milum escaped on August 7, 1970. It concluded:

"It is apparent that the threats, if such there were, were made on several different occasions and thus could not have met the statutory requirement of imminence. At best the threats were aimed at some indefinite time in the future.

. . . .

". . . Milum's evidence in its most favorable light would have shown no immediate threat; since it would not establish the supposed defense it was not error to exclude it." 213 Kan. at 583-84.

In reaching its conclusion, the court stated the following:

"Insofar as this case is concerned the key statutory phrase is that the threat must be of the 'imminent' infliction of death or great bodily harm. The codification thus embodies the common law characteristics of the defense exemplified by the encyclopedists:

'. . . In order to constitute a defense, the coercion or duress must be present, imminent, and impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. . . . The doctrine of coercion or duress cannot be invoked as an excuse by one who had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm. And threat or fear of future injury is not sufficient.' 21 Am. Jur. 2d, *Criminal Law,* §. 100.

'The compulsion or coercion which will excuse the commission of a criminal act must be present, imminent, and impending, and of such a nature as to induce a well grounded apprehension of death or serious bodily harm if the act is not done; it must be continuous, and there must be no reasonable opportunity to escape the compulsion without committing the crime. A threat of future injury is not enough, particularly after danger from the threat has passed.' 22 C.J.S., *Criminal Law,* § 44." 213 Kan. at 582.

The excerpt quoted from Corpus Juris Secundum is the third paragraph which the district court in the present case added to the pattern instruction.

In *State v. Harrison,* Harrison was convicted of aggravated robbery of a convenience store. The district court refused to admit her proffered evidence of compulsion on the ground that it was insufficient as a matter of law to sustain the defense because there was no imminent danger. The substance of Harrison's proffered evidence was that, while she was at the residence of Phil Heath, he "took her into his bedroom, produced a gun, and told her that he would use the weapon on her unless she committed the robbery in question," that attempts to subpoena Heath had been unsuccessful, and that Harrison "was fearful, not only for her own life, but also for the lives of her children if she did not complete the crime as demanded by Heath." 228 Kan. at 559.

In *Harrison,* this court stated the holding from *Milum* as follows: "[C]ompulsion, under K.S.A. 21-3209, requires as an element a threat of the *imminent* infliction of death or great bodily harm in order to constitute a defense to a criminal charge and that a threat directed at some indefinite time in the future is not sufficient." 228 Kan. at 560. This court then quoted again the excerpt from Corpus Juris Secundum which it had quoted in *Milum.*

This court concluded that the district court had acted properly:

"In our judgment, *Milum* is controlling and dispositive of this case. The general rule followed throughout the country is that in order for the defense of compulsion to be established it must be shown that the accused was without a reasonable opportunity to escape or withdraw from the criminal activity. [Citations omitted.]

"Under the proffered facts here, assuming that they are true, the defendant, having been threatened by Heath, left his house in her own car, drove away, and committed the robbery. There was nothing to prevent her from driving to the police authorities to report the threats made to her. The vague reference to her children is not sufficient to show that there was a present, imminent, and impending threat of direct or serious bodily injury to either herself or her children. She did not propose to testify that the children were in the custody of Heath at his house when she committed the robbery. Such testimony would have changed the factual situation and possibly made the defense of compulsion a factual issue for the jury." 228 Kan. at 560.

In *State v. Myers,* Myers was convicted of aggravated burglary, kidnapping, and felony murder. On appeal he argued that the district court had erred in refusing to admit proffered evidence of compulsion and to instruct the jury on the defense. This court

discussed *Milum* and *Harrison*, again quoting the excerpt from Corpus Juris Secundum. 233 Kan. at 615. This court affirmed the convictions.

The evidence showed that in connection with a drug transaction Myers and a man named Axvig entered an apartment occupied by two sisters and Kevin Kitchens, the boyfriend of one of the sisters. Myers proffered evidence that, before entering the apartment, Axvig put a gun to Myers' head, took the clip out of Myers' gun, and said, " ' "I have your family, do as I tell you or they'll be hurt." ' " 233 Kan. at 614. Myers also proffered the testimony that Axvig " 'stated that there was somebody at the house with Nanette and the kids.' " 233 Kan. at 614.

The court concluded that the proffered evidence, as a matter of law, would not have established the defense of compulsion. The court reasoned as follows:

"Compulsion, to constitute a defense under K.S.A. 21-3209, must be present, imminent, and impending; it must be continuous; there must be no reasonable opportunity to escape the compulsion without committing the crime. Here, under the proffered evidence, the compulsion was imminent when Myers entered the apartment; thereafter, when Myers was out of the sight and presence of Axvig, it was not imminent. The compulsion was not continuous; Myers and Axvig went their separate ways and operated independently; the compulsion was interrupted time after time. Finally, Myers had abundant opportunities to make his escape, and failed to do so. Myers could have freed the women before or at the time they left the apartment, and he could have made his escape before the murder was committed." 233 Kan. at 616.

The evidence in the present case of Crawford's cocaine addiction and dependence on and indebtedness to Bateman is all that distinguishes it from *Milum, Harrison,* and *Myers*. In other respects, Crawford's evidence of compulsion suffers from the shortcomings discussed in the earlier cases—the required element of an imminent threat is missing, the compulsion is not continuous, and there were opportunities for escape. The question, therefore, is whether circumstances which generally would not constitute compulsion may establish the defense due to the interpersonal dynamics of the defendant and the compelling person.

The courts of this state permit a defendant who has asserted the defense of self-defense to introduce evidence of the victim's long-term cruelty and violence toward the defendant. *State v.*

*Hundley*, 236 Kan. 461, Syl. ¶ 1, 693 P.2d 475 (1985). The admission of expert testimony on the battered woman syndrome also is allowed to "help dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time." *State v. Hodges*, 239 Kan. at 68.

In the present case, Crawford advocates that the defense of compulsion be overlaid with the battered person syndrome, as the defense of self-defense has been modified to accommodate current developments in psychological understanding. With regard to the specific alleged trial error, he advocates not that the pattern instruction be changed to reflect his new concept of compulsion, but that the added paragraph be found to be erroneous as not accommodating it.

Crawford contends that he was justified in fearing danger to himself and his son because threats had been made against them by a ruthless drug dealer with ties to a network of violent people. The reasonableness of his apprehension, he argues, should be measured in light of all the evidence of his subservience to Bateman and his perception of his options for escaping from Bateman's control being limited. His chemical dependence and psychological state, he argues, are central to a determination of reasonableness. The next step in the argument appears to be that, as in *Hundley*, an improper instruction prevented the jury from considering critical factors when determining reasonableness. In *Hundley*, use of the word "immediate" "impermissibly excluded from the jury's consideration the effect on the appellant of the history of violence toward her by the decedent." 236 Kan. at 469. In the present case, Crawford argues use of the additional paragraph, and in particular the last sentence, impermissibly excluded from the jury's consideration the effect on Crawford of his subservience to and dependence on Bateman. In other words, how would the reasonably prudent drug-dependent battered person perceive Bateman's words and demeanor? See 236 Kan. at 467.

The State correctly points out that there is no precedent in this state for a battered person syndrome defense, and, in fact, precedent militates against recognition of it. First, it should be noted that this court has very clearly stated that the battered woman syndrome, which it has recognized and about which it permits expert testimony, is not a defense. *State v. Hodges*, 239

Kan. at 73. Self-defense is the defense. Evidence about the battered woman syndrome is admitted for the purpose of aiding the jury in determining whether the defendant's fear and defense claim are reasonable. 239 Kan. at 73.

With or without the overlay of the battered person syndrome, the weakness in Crawford's theory of defense lies in the indefiniteness of any threat to him or his son. Crawford suggests that this court embrace the position taken by the Ninth Circuit Court of Appeals in *Contento-Pachon*. We do not find *Contento-Pachon* to be persuasive. The federal defense which was asserted by Contento-Pachon was duress. Its elements are: "(1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm." 723 F.2d at 693.

Not only are the facts distinguishable from the present case, but the element which the circuit court did not discuss separately is the element of reasonableness of the fear. It is precisely this element which seems most critical in the present case. It also is the element to which the evidence of Crawford's psychological state was directed.

Nor is the federal defense, at least insofar as it is discussed in *Contento-Pachon*, subject to the proviso present in the Kansas statute on compulsion. K.S.A. 21-3209(2) precludes use of the defense by "one who willfully or wantonly places himself in a situation in which it is probable that he will be subjected to compulsion or threat." A strong argument could be made that the defense of compulsion is not available to Crawford due to his placing himself in a position of dependence on and indebtedness to Bateman.

The district court's instruction to the jury on the defense of compulsion is a correct statement of the law as set out in *Milum*, *Harrison*, and *Myers*. Crawford has not presented facts or arguments which convince this court to depart from our prior decisions. We do not find the instruction to be clearly erroneous.

We next consider if the district court committed error in failing to instruct the jury on the defense of voluntary intoxication. Crawford's trial counsel did not request an instruction on voluntary intoxication. Nor did his trial counsel object when the district court judge stated that he had considered including the instruc-

tion but had concluded that it was inappropriate. Thus, the clearly erroneous standard, as previously stated in our discussion of the first issue, is applicable.

Crawford argues that there is a real possibility that, if the jurors had been instructed on voluntary intoxication, they would have found him incapable of forming the specific intent required for kidnapping, aggravated battery, and aggravated burglary. He relies on *State v. Shehan*, 242 Kan. 127, 131-32, 744 P.2d 824 (1987), for the proposition that a voluntary intoxication instruction should be given where there is "some evidence of intoxication upon which a jury might find that a defendant's mental faculties were impaired to the extent that he was incapable of forming the necessary specific intent to commit the crime."

In *Shehan*, the court rejected the notion that the instruction must be given when there is a showing of consumption of large quantities of liquor and drugs. 242 Kan. at 132. The court stated that the measure, instead, is whether there is evidence that the defendant's mental faculties were impaired as a result of the consumption. 242 Kan. at 132.

There is evidence in the present case that Crawford consumed crack cocaine before and during commission of the crimes. February 17, 1991, fell on a Sunday. Crawford testified that he believed he had last slept on Thursday night and that he had stayed awake by smoking crack cocaine when he felt tired. He testified that on the day of the crimes he smoked crack cocaine on the way to Topeka, at Looka's apartment, at Monhollon's apartment, at the Ramada Inn, and at the Holidome in Lawrence.

The record does not support the defendant's contention that his mental faculties were impaired as a result of the consumption of cocaine. First, he states that "Monhollon testified that Mr. Crawford was smoking crack and had offered him some," but Monhollon did not testify that Crawford was smoking. Monhollon was asked, "It was at the time that you were at the Ramada Inn is when you heard—is when Ace asked you if you wanted to smoke some crack cocaine?" He answered, "That's where he asked me, yes." Second, he states that "[Kinney] testified that Mr. Crawford's behavior was erratic and that he acted like he was high on drugs." Kinney was asked whether "it appear[ed] that he was on something, some sort of drugs." She answered, "I

assumed he was, only because my mother was murdered by a man on cocaine, for drug money. I assumed immediately I was going to die the same way my mother [died]." With regard to what she told the law enforcement officer who went to her house after the robbery, Kinney was asked, "I think you told him that in your opinion it appeared to be like he was on something?" She answered, "I assumed. He was very erratic."

Finally, Crawford cites the testimony of Dr. Parks as evidence supporting his claim of intoxication. Dr. Parks testified generally about cocaine addiction and mental disorders. He did not offer testimony specific to any impairment of Crawford's mental faculties due to cocaine intoxication at the time of the crimes. When Dr. Parks was asked to tie chronic depression disorder in with the events of February 17, 1991, his response was a continuation of his generalized discourse on symptoms and syndromes. In the portions of the record referenced by Crawford, there is no testimony by Dr. Parks specifying any correlation between Crawford's consumption of crack cocaine and impairment of his mental faculties at the time of the crimes.

The State argues that the evidence of Crawford's actions demonstrates little if any impairment of his ability to form specific intent to commit the crimes. It showed that he committed a number of criminal acts over a period of many hours on February 17 for the purpose of obtaining cash and valuables for drugs. It showed that he was fairly calculated in his use of force and made it commensurate with the resistance he encountered in the various victims. It showed that he took steps to avoid public detection of Monhollon's hostage status. It showed no impairment of his speech or his driving. We agree.

Crawford had the burden of showing that he was so intoxicated that he was robbed of his mental faculties. See *State v. Keeler*, 238 Kan. 356, 360, 710 P.2d 1279 (1985). He did not satisfy the burden.

Crawford next argues that his statements to the police should have been suppressed because he did not voluntarily and intelligently waive his right to remain silent. He contends that he was under the influence of cocaine, was deprived of sleep, and was coerced into making incriminating statements. The district

court held a hearing on his motion to suppress and concluded that the statements were admissible.

This court stated the standard of review as follows:

"When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely, voluntarily, and knowingly given, and admits the statement into evidence at the trial, the appellate court should accept that determination if it is supported by substantial competent evidence." *State v. William*, 248 Kan. 389, Syl. ¶ 13, 807 P.2d 1292, *cert. denied* 116 L. Ed. 2d 89 (1991).

In the trial court the burden of proof is on the State. K.S.A. 22-3215(4). On appeal this court will consider whether the burden was properly placed by the district court in making its ruling on the defendant's motion to suppress his statements. See 248 Kan. at 409.

Crawford contends that there is substantial evidence that his "will was overborne." He points to evidence of his lack of sleep, his dependence on cocaine, and his smoking cocaine shortly before being taken into custody. At the suppression hearing, he testified that the police would not allow him to go to sleep and kept threatening to "whop" him if he did not answer questions. An officer who was present during the questioning was asked whether Crawford appeared to be falling asleep; he answered: "I never saw him sleeping. I saw him put his head, look down at the desk, but we could—the interview continued and he continued to respond to questions."

Crawford also argues that he was coerced into making statements by "implied promises" of drugs and deals. He testified that one of the police officers "informed [him] that he was going to get the head guy for [him] to speak with in the process while I was being questioned." When asked about the purpose of talking to a "head guy," he testified: "Because I felt that the exchange that I was giving them like to recover some of the jewelry and stuff like that and the information on between Larry Bateman and Sharon Shoate was that that could be put down in my behalf." When asked if anyone ever offered him anything to talk, he said: "It was like a sign that I was going to get a deal from the DA from Detective Fox." When asked why he assumed he would get a deal from the district attorney, he said:

"[Detective Fox] said that he'd been known for, I don't know which DA he was referring to, but he said he'd know the man and they're pretty all right and if I cooperate that he's pretty sure that he'll be able to put in a good word for me."

When asked about any other offers made to him, Crawford testified:

"At one point when I was giving them some information on where I believe[d] the jewelry that was taken during the crime spree could be located, I was led to believe that I was going to be able to go with them to the house and get it and that I might be able to get some more cocaine."

He also points out that the cocaine and pipe which had been taken from him remained in the interrogation room; he likens its presence to an "implied promise" that he would get it back.

Kansas courts follow this standard:

"A confession must be voluntary to be admissible. A person's mental capacity is relevant in determining whether a confession was voluntary. *Culombe v. Connecticut*, 367 U.S. 568, 602-03, 6 L. Ed. 2d 1037, 81 S. Ct. 1860 (1961). In determining whether a confession is voluntary, a court is to look at the totality of circumstances. *Fikes v. Alabama,* 352 U.S. 191, 197, 1 L. Ed. 2d 246, 77 S. Ct. 282, *reh. denied* 352 U.S. 1019 (1957)." *State v. William*, 248 Kan. at 406.

Crawford contends that a look at the totality of circumstances shows that his confession was not voluntary; the State contends otherwise.

We conclude that there is substantial competent evidence to support the district court's determination that, in the totality of the circumstances, Crawford's statements were voluntary.

Crawford next contends that three of the four counts of aggravated robbery of the same victim were multiplicitous to the fourth one. The district court refused to dismiss Counts 7, 12, and 16, which charged Crawford with aggravated robbery of Monhollon. Crawford argues that those counts are multiplicitous to Count 5, which also charged him with aggravated robbery of Monhollon.

Count 5 charged Crawford with taking Monhollon's car, checkbook, and wallet at Parkview Hospital. Count 7 charged him with taking $6, clothing, and food from Monhollon the first time the two of them entered the apartment. Count 12 charged Crawford with taking Monhollon's VCR, coins, radio, jewelry, and cologne

when they returned to the apartment after robbing Looka. Count 16 charged him with taking $60 when Monhollon was forced to withdraw cash from an automatic teller machine.

Crawford argues that the multiple counts charging him with repeated aggravated robbery of the same person violate the "single larceny doctrine." He quotes the following definition from *State v. Roberts*, 210 Kan. 786, 791, 504 P.2d 242 (1972), *cert. denied* 414 U.S. 832 (1973):

"When property is stolen by a succession of takings from the same owner and from the same place, each taking is a separate crime if it results from a separate impulse or intent. However, if it appears that a single incriminating impulse or intent is involved in the successive [takings], they constitute a single larceny."

He also cites *State v. McQueen & Hardyway*, 224 Kan. 420, 430-31, 582 P.2d 251 (1978); *State v. Gordon*, 146 Kan. 41, 68 P.2d 635 (1937); and *State v. Hall*, 111 Kan. 458, 207 Pac. 773 (1922).

In *State v. Grissom*, 251 Kan. 851, 840 P.2d 1142 (1992), we stated the following rules with regard to the single impulse rule and multiplicity:

"A test for determining if a continuous transaction results in the commission of but a single offense is whether separate and distinct prohibited acts, made punishable by law, have been committed. A single motive for a series of acts does not result necessarily in a single crime." Syl. ¶ 10.

"Multiplicity exists if the State uses a single wrongful act as the basis for multiple charges. Charges are not multiplicitous if each charge requires proof of a fact not required in proving the other. Charges are also not multiplicitous if the offenses occur at different times and in different places." Syl. ¶ 12.

Grissom drove a woman to various branches of a bank to withdraw money from her account and was charged separately for each transaction. He complained that the single larceny doctrine should have been applied to the resulting four counts of robbery against him. Grissom, like Crawford, relied on *Roberts*. This court rejected his logic:

"Grissom . . . overlooks the very language he quotes: 'When property is stolen by a succession of takings from the same owner *and from the same place*, each taking is a separate crime if it results from a separate impulse or intent.' (Emphasis added.) Here, the robberies did not occur in the same place. *Roberts* is not controlling on the instant facts." 251 Kan. at 896.

The holding in *Grissom* is controlling in the present case. The same reasoning eliminates any merit to Crawford's claims that Counts 5 and 16 are multiplicitous to Counts 7 and 12.

The robberies which are charged in Counts 7 and 12 both occurred in Monhollon's apartment, but they occurred at different times. The first occurred when Crawford first arrived at the apartment from the hospital. Following the first robbery, Crawford took Monhollon next door to Looka's apartment where he used Monhollon to gain entry. The evidence shows that a substantial period of time was spent by Crawford inside Looka's apartment where he ransacked her cabinets, drawers, and containers and ate food from her kitchen. The second robbery occurred in Monhollon's apartment after they returned from Looka's.

In *Grissom*, the court rejected the argument that the four robbery convictions were multiplicitous because they resulted from a single impulse:

"[E]ven if the robberies resulted from a single motive or a single criminal impulse, the jury was not required to find a single crime. 'Whether or not the separate acts were the result of one larcenous impulse or plan is a question of fact to be determined by the jury.' *State v. Fox*, 242 Kan. 457, 463, 749 P.2d 16 (1988); see *State v. McClanahan*, 251 Kan. 533, Syl. ¶ 2 [, 836 P.2d 1164 (1992)]. Here, the jury found the evidence supported four robberies—four separate and distinct prohibited acts." 251 Kan. at 896.

Finally, Crawford questions the controlling sentence of 60 years to life. The question arose because the district court judge, who intended to impose a term of 15 years to life for Crawford's acts toward each of the four victims and to run each of those terms consecutively, imposed one term and then stated that each of the other three would run consecutively to the first.

Here is the imposition of sentence:

"THE COURT: It's the judgment and sentence of the Court as to Count 1, aggravated robbery, that the defendant serve a term of from 15 years to life in the custody of the Secretary of Corrections. As to Count 2, where the defendant was convicted of aggravated battery, the Court will impose a sentence of not less than 5 nor more than 20 years. That sentence is to be served concurrently with the sentence imposed in Count 1. As to Count 3, the attempted kidnapping charge, the jury found the defendant not guilty. As to Count 4, kidnapping, [the] Court will impose a sentence of from 15 years to life, consecutive to the sentence imposed in Count 1. As to Count 5, aggravated robbery, the Court will impose a sentence of from 15 years

to life, concurrently with the sentence imposed in Count 1. As to Count 6, aggravated burglary, the Court will impose a sentence of not less than 5 nor more than 20 years. The sentence to be served concurrently with the sentence imposed in Count 1. As to Count 7, aggravated robbery, the Court will impose a sentence of from 15 years to life. The sentence to run concurrently with the sentence imposed in Count 1. As to Count 8, aggravated burglary, the Court will impose a sentence of not less than 5, nor more than 20 years. The sentence to be served concurrently with the sentence imposed in Count 1. As to Count 9, aggravated robbery, the Court will impose a sentence of not less than 15 years to life. The sentence to be served consecutive to the sentence imposed in Count 1. As to Count 10, kidnapping, [the] Court will impose a sentence of from 15 years to life, concurrently with the sentence imposed in Count 1. As to Count 11, aggravated burglary, the Court will impose a sentence of not less than 5 nor more than 20 years. The sentence to be served concurrently with the sentence imposed in Count 1. As to Count 12, aggravated robbery, the sentence will be from 15 years to life. The sentence to be served concurrently with the sentence imposed in Count 1. As to Count 13, aggravated burglary, the Court . . . will impose a sentence from 5 to 20 years to be served concurrently with the sentence imposed in Count 1. As to Count 14, aggravated battery, the Court will impose a sentence from 5 to 20 years to be served concurrently with the sentence imposed in Count 1. As to Count 15, aggravated robbery, the Court will impose a sentence of from 15 years to life. The sentence to be served consecutive to the sentence imposed in Count 1. As to Count 16, the Court will impose a sentence of which was also— which is aggravated robbery. The Court will impose a sentence from 15 years to life to be served concurrently with the sentence imposed in Count 1.

"I believe the net effect of the sentence in this case is to impose a sentence from 60 years to life. In effect, the defendant has received a sentence of from 15 years to life for the crimes involving each of the four victims, which I think is a fair sentence under the circumstances in this case. If there's nothing further, the defendant is remanded to custody."

The prosecutor immediately sought clarification whether all the 15-years-to-life sentences ran consecutively with each other. The district court judge answered, "No, the four of them are." The district court judge then stated, "Well, my intention was to impose a sentence from 60 years to life." The district court's journal entry contains the following paragraph:

"The Court orders that all counts shall run concurrently with one another with the exceptions that Counts one, four, nine and fifteen, shall run consecutively to each other. The Court expressly notes its intent that the defendant shall receive a controlling sentence of sixty years, to life."

On appeal, Crawford argues that principles of law set forth in *State v. Moses*, 227 Kan. 400, 607 P.2d 477 (1980), and *State v. Zirkle*, 15 Kan. App. 2d 674, 814 P.2d 452 (1991), prevent the district court judge from stiffening the 30-years-to-life sentence he spelled out. In *Moses*, where there was a question of the timeliness of the appeal, this court stated: "The journalized entry is thus a *record* of the sentence imposed; but the actual *sentencing* occurs when the defendant appears in open court and the judge orally states the terms of the sentence." 227 Kan. at 402.

In *Zirkle*, the court sentenced Zirkle to a term of one to five years, then discovered that earned jail time credit placed Zirkle close to release, and in the next breath vacated the sentence and resentenced him to two to five years. 15 Kan. App. 2d at 675. The Court of Appeals reasoned that, based on *Moses*, the sentence was effective when announced and, under K.S.A. 1990 Supp. 21-4603(4)(a), could not be modified upward. Thus, the Court of Appeals held: "Once a sentence is imposed, the district court is powerless to vacate that sentence and impose a harsher sentence." 15 Kan. App. 2d at 678.

Crawford's point, that it is what the district court judge said at the time of sentencing in open court which controls rather than what was written in the journal entry, is well taken. Application of that rule, however, does not resolve the question in the present case. Here, at the time of sentencing in open court, the district court judge concluded his recitation of the numerous terms by stating that he believed that he had imposed a sentence of 60 years to life. Here the discrepancy is between what the judge stated he intended to impose and what the judge stated when he articulated the terms and how they were to run in relation to each other.

This case is distinguishable from *Zirkle* in that the judge in this case did not change his mind, vacate the sentence, and try to change the length of the sentence. Here the judge consistently intended to sentence Crawford to 60 years to life. In articulating the terms, however, he either miscalculated or misspoke. However, upon inquiry by the State, he clarified that the four 15-years-to-life sentences were to run consecutively to each other. The imposition of sentence included the statement by the district

court judge that the four 15-years-to-life sentences will run consecutively to each other. The trial judge is not required to make this determination in any particular sequence when imposing sentence. All that is required is that it be made at the time sentence is imposed. That requirement was met here. The journal entry properly reflects the sentence imposed by the district court at the time of sentencing.

The judgment of the district court is affirmed.