No. 90,420

STATE OF KANSAS, *Appellee*, v. MELVIN W. HOLMES, *Appellant*.

(102 P.3d 406)

Opinion filed December 17, 2004.

*Carl F. A. Maughan,* of Law Offices of Carl Fredrick Alexander Maughan, L.L.C., of Wichita, argued the cause and was on the brief for appellant, and *Melvin W. Holmes,* appellant, was on a supplemental brief pro se.

*Lesley A. Isherwood,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Phill Kline,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Melvin W. Holmes was convicted by jury of premeditated first-degree murder and criminal possession of a firearm. His hard 40 sentence and convictions were reversed by this court on the basis of prosecutorial misconduct, and his case was remanded for a new trial in *State v. Holmes,* 272 Kan. 491, 33 P.3d 856 (2001) (*Holmes I*). He was tried again for the same charges, convicted by the jury, and sentenced by the court to a hard 40 sentence. He again appeals, raising those issues not addressed in his first appeal, see 272 Kan. at 491, as well as new issues. A statement of the basic facts appears in *Holmes I,* 272 Kan. at 492-93, supplemented by the following facts.

Holmes and Glenda Smith dated for over 2 years and lived together in Smith's home for 6 months prior to Smith's death. On March 6, 1999, Holmes and Smith spent the day at Smith's home using drugs. Both were habitual drug users. Holmes had taken heroin and cocaine approximately three times and smoked crack at least three times, while Smith had injected cocaine throughout the day. Around midnight, Smith showed signs of paranoia ("tweaking") because of the drug use and was seen looking out the window and holding a knife. Smith eventually left her residence for 25 to 30 minutes and upon return went into the bathroom. Because Smith's veins were poor, her usual stay in the bathroom was 35 to 40 minutes if she was injecting cocaine. Sometime later, Smith left the bathroom and went into the bedroom where she laid down next to Holmes on the bed.

Soon after, Smith began "nagging" Holmes. Their relationship was problematic because Holmes did not have a job and had sold all his belongings to obtain drugs to support their habits. Holmes grabbed a hammer located next to the bed and hit Smith on the back of her head. The hammer blow broke Smith's skin and would

have required five stitches had she lived through the ensuing events. Smith jumped up from the bed and grabbed her gun. The fight moved from the bedroom to the hallway as the two struggled for control of the gun. The gun clicked several times but did not fire. In the hallway, Holmes pushed Smith to the floor and pinned her down with one knee. Although the gun was pointed at Smith's chest, she continued to fight and placed both hands on the gun while Holmes had one hand on the gun. Holmes threatened Smith that he "could" or "would" kill her, but Smith continued to fight when the gun went off.

Holmes and Smith both let go of the gun, and the gun dropped on Smith's chest. The bullet traveled through her heart. Believing she was dead, Holmes immediately went into the bathroom where he injected a combination of cocaine and heroin ("speedball") and had a drug-induced seizure. The time of shooting is disputed, but after Holmes recovered from his seizure, he called 911 and told them that "he had shot his girlfriend." The call was made at 5:19 a.m.

When police officers arrived and knocked on the door, Holmes opened the door and calmly walked toward the officers to be hand-cuffed. After the officers placed Holmes in their patrol car, they conducted a safety sweep of the house and found Smith. At 5:52 a.m., Officer Travis Easter asked Holmes who lived in the residence. Holmes responded that he lived in the residence, but it was Smith's house. Easter asked Holmes if he was willing to sign a consent to search the home form so that the lab personnel could examine the scene. Holmes agreed to sign. The officers took Holmes out of the patrol car, unhandcuffed him, and Holmes signed the consent to search. Easter then placed Holmes back into the patrol car and transported him to the police station for questioning. The only conversations between Easter and Holmes pertained to the heat temperature in the car, if Holmes' dog was loose, and a squeaking noise Holmes heard from a nearby car. The defendant initiated each conversation.

At 6:06 a.m., Easter placed Holmes in an interview room. At 7:15 a.m., Detectives Joseph Schroeder and Blake Mumma entered the room. Schroeder observed that Holmes was quiet, sub-

dued, and had his hands around his face as if he was resting his head on them. In order to establish a rapport with Holmes, Schroeder obtained Holmes' personal history information using a standard form which included name, address, date of birth, social security number, employment history, family history, place of birth, prior arrests, height, weight, military background, and schooling. In addition, Schroeder questioned Holmes about his relationship with Smith.

After the 5-to 10-minute personal information interview, Schroeder advised Holmes of his *Miranda* rights, reading verbatim from a "Your Rights" form, and Holmes signed the *Miranda* waiver. When the detectives questioned Holmes about the shooting, Holmes shook his head and said, "I think I'll just quit talking, I don't know." Mumma redirected the interrogation, and Holmes continued to talk. The interrogation ended around 10 a.m. Before the detectives left, Mumma presented Holmes with a consent to search his person form in order to obtain scrapings and wipings from his body. Holmes signed the consent.

On March 9, 1999, Holmes was charged with one count each of first-degree murder and criminal possession of a firearm. On September 3, 1999, Holmes filed a motion to suppress the statements made during the interrogation and the evidence gathered from the consent to search his person. The court held an evidentiary hearing and overruled the motion, finding that the statements, waiver of rights, and consent to search were all given voluntarily and knowingly. On September 15, 1999, a jury convicted Holmes of both counts. Holmes appealed, and on November 9, 2001, this court reversed the jury convictions and remanded his case to the district court for a new trial based on prosecutorial misconduct.

Prior to the second trial, Holmes filed a pro se motion to suppress. The court overruled the motion without an evidentiary hearing, finding that the motion had been previously heard and overruled by the court. The second jury convicted Holmes of both counts, and a hard 40 sentence was imposed for the first-degree murder, followed by a consecutive sentence of 9 months for the criminal possession of a firearm.

In this appeal, Holmes contends: (1) The trial court erred in denying his motion to suppress because (a) the search of the residence was unlawful thereby invalidating his statements to police; (b) in the alternative, his statements to the police were involuntary; and (c) he invoked but was denied his *Miranda* rights; (2) the court erred by failing to grant an evidentiary hearing on his second motion to suppress; (3) the trial court abused its discretion in various parts of the trial; (4) the trial court erred in denying Holmes' pro se motion for ineffective assistance of counsel; (5) insufficient evidence was presented to establish premeditation; (6) the trial court failed to instruct on the effect of sympathy and prejudice; (7) insufficient evidence supported the aggravating factors for the hard 40 sentence; (8) prosecutorial misconduct occurred during closing arguments; and (9) cumulative errors require the reversal of his convictions.

(1) <u>Denial of Motion to Suppress</u>

   (a) The search of the residence was unlawful, thereby invalidating Holmes' statements to police.

Holmes claims he did not voluntarily give his consent to search the residence because he was under the influence of drugs, held in police custody for 45 minutes prior to signing the consent, and not advised that he had the right to refuse to sign the consent. He argues that his consent to search the home was involuntary and his confession must be suppressed as fruit of the poisonous tree infected by the unlawful search and seizure of evidence from the residence.

While the State contends the search and seizure issues are not properly before this court because they were not raised by Holmes during the first trial, our review of the record establishes that the issue of his consent was litigated during the suppression hearing in the first trial. The State further argues that Holmes did not object to the consent to search at trial and thus the issue was not preserved for appeal. When a motion in limine or a motion to suppress is denied, the moving party must object to the evidence at trial to preserve the issue on appeal. *State v. Saenz*, 271 Kan. 339, 349, 22 P.3d 151 (2001). Holmes failed to object to Officer Easter's testi-

mony regarding Holmes' consent. However, because consent was raised by Holmes during his suppression hearing and this issue is so integral to his argument regarding the admissibility of his confession, we elect to address the issue.

" 'The existence and voluntariness of a consent to search and seizure is a question of fact that the trier of fact must decide in light of the totality of the circumstances; the trial court's decision will not be overturned on appeal unless clearly erroneous. *State v. Buckner,* 223 Kan. 138, 144, 574 P.2d 918 (1977). The State must prove voluntariness by a preponderance of the evidence. 223 Kan. at 143.' " *State v. Rexroat,* 266 Kan. 50, 55, 966 P.2d 666 (1998) (quoting *State v. Ruden,* 245 Kan. 95, 105, 774 P.2d 972 [1989]).

"In determining whether consent was voluntary, the trial court should consider whether the individual was threatened or coerced, and whether he was informed of his rights. [Citation omitted.]" *Ruden,* 245 Kan. at 105. The individual's mental state is also a factor in determining the voluntariness of his or her consent to search. See *United States v. Watson,* 423 U.S. 411, 424-25, 46 L. Ed. 2d 598, 96 S. Ct. 820 (1976).

The evidence admitted during Holmes' motion to suppress, the testimony of Officer Easter regarding Holmes' signing the consent to search, and the absence of any evidence indicating that Holmes' consent to search was anything but his free and voluntary choice support the determination that Holmes' consent was voluntary. Knowledge of the right to refuse consent is not required for a finding of voluntariness. See *Watson,* 423 U.S. at 424-25; *Schneckloth v. Bustamonte,* 412 U.S. 218, 234, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973). Based upon the totality of all the circumstances, including the testimony elicited at the hearing on Holmes' motion to suppress in his first trial as set forth below, we conclude that the trial court was correct in its determination that the consent was voluntary and the evidence seized was properly admitted into evidence. See *State v. Wimberly,* 246 Kan. 200, 210-11, 787 P.2d 729 (1990). Thus, the search of the residence was correctly based upon Holmes' voluntary consent to search. We therefore reject Holmes' argument that his confession be suppressed under the fruit of the poisonous tree doctrine.

(b) In the alternative, Holmes' statements to the police were involuntary.

Holmes contends that his confession must be suppressed as involuntary for the following reasons: (1) He was still under the influence of the drugs; (2) he was suffering from sleep deprivation at the time he was read his *Miranda* rights; (3) officers failed to honor his *Miranda* rights after he expressed a desire to stop talking; (4) he was held in the interrogation room alone; and (5) he was emotionally grieving over the death of the victim.

In regard to our scope of review as to whether Holmes' confession was voluntary, the determination that a statement was freely, voluntarily, and intelligently given will be upheld if there is substantial competent evidence to support such a conclusion. In making the factual review, the appellate courts will not reweigh the evidence and will give deference to the factual findings of the trial court. The legal conclusion drawn from those facts is subject to de novo review. *State v. White*, 275 Kan. 580, 596-97, 67 P.3d 138 (2003).

"To determine whether a defendant's confession is voluntary, a court looks at the totality of the circumstances. The prosecution bears the burden of proving that a confession is admissible by a preponderance of the evidence. Factors include the duration and the manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry is whether the statement was the product of the free and independent will of the accused." *White*, 275 Kan. 580, Syl. ¶ 8.

The question of whether Holmes' confession was the product of his free and independent will is primarily dependent upon the facts surrounding the statements given. The statements given by Holmes were videotaped. A redacted version of the videotape was played to the jury, and the jury was given a transcript. However, Holmes failed to include these exhibits in the record on appeal. The burden is on Holmes to furnish a record which affirmatively shows that prejudicial error occurred in the trial court. Without such a record, an appellate court presumes the action of the trial court was proper. *State v. Decker*, 275 Kan. 502, 507, 66 P.3d 915 (2003).

The available evidence regarding Holmes' confession supports the conclusion that his confession was voluntary. Officers Schroeder and Mumma entered the interrogation room 1 hour after Holmes was placed there by Officer Easter and over 2 hours after Holmes' last possible drug use based upon Holmes' call to 911. Schroeder testified that Holmes did not display any signs that he was incapacitated. Holmes was coherent, able to answer questions and speak with the detectives logically, and demonstrated the ability to recall past events. However, Holmes did appear tired and answered slowly during the personal history interview, and Schroeder did not explain to Holmes the consequences of waiving his *Miranda* rights.

In addition, Mumma testified that Holmes did not indicate that he was sick but did inform the detectives that he had used a large amount of drugs within the last 24 hours. Mumma did not explain to Holmes the importance of the rights he was giving up — believing that they were self-explanatory. However, Mumma noted that Holmes stated that he had previously been *Mirandized* during other investigations.

Holmes argues that his mental condition rendered his confession involuntary. See *State v. McCorkendale*, 267 Kan. 263, Syl. ¶ 3, 979 P.2d 1239 (1999) (Mental condition is a factor to be considered in determining the voluntariness of a confession.). Holmes points to evidence of substantial drug use over the prior 24-hour period, sleep deprivation, emotional grief over his girlfriend's death, and her blood being on him, which added to the circumstances showing that he lacked the mental capacity to waive his rights. He contends that these circumstances produced an environment where a free, voluntary, and intelligently considered waiver was impossible.

(1) Drug use

Holmes contends that his drug use impaired his ability to voluntarily give his confession. In response, the State cites two cases in arguing that Holmes' drug use did not render his confession involuntary. In *State v. Jacques*, 270 Kan. 173, 189, 14 P.3d 409 (2000), the court determined that Jacques' confession given after he had used cocaine was voluntary because he was "able to answer questions in a coherent manner, follow the conversation, under-

stand what was being asked of him, had experience with the *Miranda* form, and had been questioned by the police on a previous occasion." As such, Jacques' use of cocaine prior to being questioned did not automatically require the trial court to suppress statements made during investigation. 270 Kan. at 188.

In *State v. Harden*, 206 Kan. 365, 480 P.2d 53 (1971), Harden was under the influence of alcohol during the confession. The detectives could not detect that the drinking interfered with his responses or understanding of questions because his answers were very precise and normal. The *Harden* court concluded that the defendant's mental condition had not been impaired to the extent that the statement was involuntary. 206 Kan. at 370-72.

We believe that this case is most analogous to *White*, 275 Kan. 580, a case not cited by either party. White testified that he was high on "wet" (cigarette or marijuana dipped in chemicals such as PCP or formaldehyde) at the time of his interrogation by the detectives. One detective testified that White was coherent, wide awake, and showed no signs of being under the influence of "wet" (typically having a strong chemical smell, being very violent, and exhibiting extremely bizarre and rude behavior). The court declined to reweigh the evidence and found substantial evidence supported the district court's finding that the statement was voluntarily made. 275 Kan. at 597-98.

In this case, the detectives testified that Holmes appeared coherent, answered questions rationally, and recalled events leading up to the shooting. In addition, he was cooperative with the detectives and showed no signs of being under the influence of drugs except for appearing tired. Holmes further argues that his drug use limited his ability to give consent and analogizes his drug impairment to cases where a person was raped, where a person blacked out, or where a person was intoxicated and unable to move or speak. In light of the more relevant authority just discussed, the court need not draw these comparisons to the cases Holmes cites. Substantial evidence supports the trial court's findings that Holmes' statements were not involuntary based on his drug use and were knowingly given.

(2) Sleep deprivation

Holmes argues that "sleep deprivation plays tricks on the mind [and] can only be seen as a period of great instability for any man making him a ready victim for an inquisition." The State responds that Holmes had approximately 4 to 5 hours of sleep the night before. Neither party cites any authority regarding what role sleep deprivation plays on the voluntariness of a confession.

In *State v. Crawford*, 253 Kan. 629, 643-44, 861 P.2d 791 (1993), Crawford argued that his "will was overborne" due to lack of sleep and use of cocaine. The officers would not allow him to sleep and threatened to "whop" him if he did not answer questions. One officer testified he never saw Crawford sleeping but " 'saw him put his head down, look down at the desk, but . . . the interview continued and he continued to respond to questions.' " 253 Kan. at 644. The *Crawford* court found under the totality of the circumstances that despite claims of being under the influence of cocaine, sleep deprivation, and coercion, Crawford's statements were voluntary. 253 Kan. at 643-45. See also *State v. William*, 248 Kan. 389, 410, 807 P.2d 1292, *cert. denied* 502 U.S. 837 (1991) (confession was voluntary where the defendant did not ask for sleep and the evidence did not indicate that the officers promised the defendant he could go to sleep as soon as he confessed).

In this case, the detectives testified that during the interrogation Holmes stated that he habitually slept for 4-to 5-hour intervals. However, the detectives observed that even though Holmes continued to answer questions during the interrogation, he appeared tired and rested his head on his hands at times. Without evidence that Holmes asked to sleep or that he was not allowed to sleep, we cannot conclude that sleep deprivation rendered his statement involuntary.

(3) Isolated in police custody

Holmes was isolated in police custody for 1 hour and 9 minutes before the detectives entered the interview room at 7:15 a.m. *Miranda* rights were given approximately 15 minutes afterwards. The interrogation lasted until 10 a.m., and Holmes was secured to the table and floor in isolation until 11:45 a.m. Between 11:45 a.m. and 12:50 p.m., Holmes signed the consent to search his person and

was processed for those items. The second interview, which began at 1 p.m. and ended 15 minutes later, involved questions regarding how to contact Smith's daughter. At 1:22 p.m., Holmes was taken to a jail cell.

Holmes argues that the fact he was isolated in police custody when he was asked to confess was "inherently coercive," even though he admits there was no evidence of overt coercion on the detectives' part. The State responds that since the interrogation was not conducted in an overbearing, coercive manner and was not overly lengthy, Holmes' confession was knowingly and voluntarily made.

Holmes asserts that courts have recognized that there is an inherently compulsive or coercive nature to postarrest confessions involving isolation in custodial surroundings, citing *Miranda v. Arizona*, 384 U.S. 436, 458, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). Kansas courts have recognized that the procedural safeguards of *Miranda* are to be timely applied when the police fail to warn a person in custody of his or her *Miranda* rights and use deliberately coercive or improper tactics to obtain an incriminating statement. See *State v. Lewis*, 258 Kan. 24, 35-37, 899 P.2d 1027 (1995) (suspect was arrested, held for 10 hours, and only warned of *Miranda* rights upon making an incriminating statement).

Holmes admits there was no evidence of overt coercion and that the detectives read him his *Miranda* rights prior to any questioning regarding the shooting. In addition, Holmes was isolated for only approximately an hour before the first interrogation. Thus, the evidence is insufficient to establish that the mere fact of being isolated in police custody was inherently coercive. Holmes' isolation in police custody did not render his statements involuntary.

(4) Emotional state

Holmes also contends that his emotional grief over his girlfriend's death and the fact that he had her blood on him rendered his waiver involuntary. Holmes cites *Haley v. Ohio*, 332 U.S. 596, 599-600, 92 L. Ed. 224, 68 S. Ct. 302 (1948), in arguing that his fragile emotional and mental state was similar to that of a 15-year-old minor. Consequently, he contends the State's burden to prove a knowing and voluntary waiver should be greater.

In *State v. Jones*, 218 Kan. 720, 722, 545 P.2d 323 (1976), the court held that an accused charged with the crimes of murder and robbery might be under a certain amount of emotional stress; however, the court could not say that because defendant was crying he could not freely and voluntarily confess to the crimes. See also *State v. Goering*, 8 Kan. App. 2d 338, 347, 656 P.2d 790 (1983) (Meyer, J., dissenting) (the fact defendant became emotional during confession does not make that confession any less the product of free will).

Holmes has not pointed to any evidence indicating that he showed emotional stress or grief during the interrogation, and the fact he had the victim's blood on him does not render his confession involuntary. Looking at the totality of the circumstances, Holmes' confession was freely, voluntarily, and knowingly made. Holmes admits the interrogation was noncoercive, and the detectives followed procedural safeguards against inherent coercion by reading Holmes his *Miranda* rights. Also, Holmes' waiver of *Miranda* rights and his ability to communicate were not impaired by his drug use, sleep deprivation, or his emotional state. Substantial evidence supports the district court's finding that Holmes' statements were freely, voluntarily, and intelligently given.

(c) Invocation of *Miranda* rights

Holmes conversed with the detectives during the initial interrogation, but when they reached the point of questions regarding details of the shooting, he shook his head and said, "I think I'll just quit talking, I don't know." Mumma took Holmes' statement to mean that he was uneasy about the line of questioning and that he did not appear comfortable with the direction the conversation was taking. Mumma moved the interrogation in another direction, and Holmes continued to talk. The court ruled that Holmes' statements were all voluntary.

Holmes' pro se motion alleged that Detective Schroeder testified that Holmes never expressed his desire to stop talking to the detectives. However, Schroeder testified during the first suppression hearing that Holmes said, " 'I think I'll quit talking' and 'I don't know.' And that's when Mumma said, 'Would you like to talk about something else?' and [Holmes] said, 'Yes.' "

Holmes' brief does not specifically address this issue, but his pro se motion to suppress alleges that the detectives failed to honor his invocation of *Miranda* rights when they continued to interrogate him after he expressed a desire to stop talking. He contends that the statements regarding the shooting should have been suppressed. The State responds by classifying his statement as an ambiguous request and, thus, the detectives were not required to stop to clarify his statement. Holmes' failure to provide the court with the original and redacted videotape or the transcript of the interrogation makes resolution of this issue difficult; the absence of such a record creates a presumption that the action of the trial court was proper. See *State v. Navarro*, 272 Kan. 573, 588, 35 P.3d 802 (2001).

A suspect must unambiguously request counsel so that a reasonable police officer in those circumstances would understand the statement to be a request for an attorney. *State v. Ninci*, 262 Kan. 21, 41, 936 P.2d 1364 (1997). The same rule applies to the right to remain silent. *State v. Donesay*, 265 Kan. 60, 73, 959 P.2d 862 (1998). When a suspect makes a statement which might be ambiguous as to whether the suspect is asserting a right to remain silent or to confer with counsel, the interrogator may ask questions to clarify, but the interrogator is not required to clarify and may continue the questioning. *State v. Speed*, 265 Kan. 26, 37-38, 961 P.2d 13 (1998).

The State cites *State v. Morris*, 255 Kan. 964, 975-76, 880 P.2d 1244 (1994), and *McCorkendale*, 267 Kan. at 273, in support of its position. In *Morris*, the court found the statement " 'I'm not sure what I want to do' " was not an unambiguous invocation of rights. 255 Kan. at 976. In *McCorkendale*, the court held that the statement " 'So that's all I [got] to say' " was not an unequivocal invocation of his right to remain silent, and since it could have also been interpreted as a statement that he had finished explaining the matter, the statement was at best ambiguous. 267 Kan. at 273.

However, we believe the statement in this case is most analogous to *State v. Fritschen*, 247 Kan. 592, 606, 802 P.2d 558 (1990), where Fritschen stated, " 'I don't want to talk about it any more, it hurts too much.' " The officer interpreted this to mean that

Fritschen was not invoking his right to silence but that he did not want to think about the murder. The officer asked Fritschen if he would continue answering questions, and Fritschen agreed. The *Fritschen* court, citing *Smith v. Illinois*, 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490 (1984), stated that only prior statements and the statement itself may be looked at in determining whether the statement itself is ambiguous. 247 Kan. at 607. A defendant's words are treated as if they are plain and unambiguous and, therefore, not subject to construction. See *Donesay*, 265 Kan. at 68. The court interpreted that Fritschen was saying he was upset and having difficulty talking and, thus, the statement did not even reach the level of a potentially ambiguous request. *Fritschen* also found that even if the request was ambiguous, the officer's further inquiry concerning whether the defendant wanted to continue answering questions followed proper procedure. 247 Kan. at 607-08.

As in *Morris, McCorkendale,* and *Fritschen,* we interpret Holmes' statement that "I think I'll just quit talking, I don't know" as an ambiguous invocation of rights. The statement could be construed as not wanting to talk about the shooting details at that moment in the interrogation but not knowing if he should. However, Holmes' statement could also be construed as an assertion of his right to remain silent. Nevertheless, the officers followed proper procedure by further inquiring whether he wanted to talk about something else. The trial court properly denied the motion to suppress, finding that all statements were voluntary and given freely and knowingly.

Applying our standard of review, we conclude that the facts found by the trial court were supported by substantial competent evidence. Those facts support our independent legal conclusion that Holmes' confession was voluntarily given. We therefore affirm the trial court's admission of Holmes' confession during trial.

(2) Failure to Grant a Second Evidentiary Suppression Hearing

Before the first trial, defense counsel filed a motion to suppress. Judge James Fleetwood held an evidentiary hearing and denied the motion. After the case was remanded from this court for a new trial, Holmes filed a pro se motion to suppress and pro se memo-

randum in support of the motion. Judge Clark V. Owens II overruled the second motion, finding that the court had previously heard and overruled the suppression issue.

The trial court can reentertain an earlier motion to suppress which has been denied. *State v. Jackson*, 213 Kan. 219, Syl. ¶ 1, 515 P.2d 1108 (1973); *State v. Olson*, 11 Kan. App. 2d 485, 488, 726 P.2d 1347 (1986). The decision to rehear an earlier motion is a matter which lies within the sound discretion of the trial court. *State v. Riedel*, 242 Kan. 834, 837, 752 P.2d 115 (1988). Discretion is abused when no reasonable person would agree with the trial court. *Sterba v. Jay*, 249 Kan. 270, 279, 816 P.2d 379 (1991).

Holmes argues that he was denied due process when the district court summarily overruled his pro se motion to suppress filed prior to the second trial without granting an evidentiary hearing. Holmes asserts that his second motion was not identical to the first motion because it raised new issues and additional evidence not previously presented. Specifically, he alleges that he did not freely and voluntarily give his consent to search the home and that the law enforcement officers gave inconsistent statements at the first suppression hearing and the first trial. For those reasons, he asks this court to reverse the trial court's decision and remand for an evidentiary hearing on the pro se motion to suppress.

The State responds that this issue is not properly before this court for two reasons: (a) Holmes was not entitled to hybrid representation and (b) defense counsel only objected to issues outlined in the first motion to suppress and failed to object to the introduction of the evidence at trial. Even if the merits of the issue are addressed, the State argues an evidentiary hearing was not required because the second motion's allegations are without merit.

(a) Hybrid representation.

While a party has the right to represent himself or herself or be represented by counsel, he or she does not have the right to a hybrid representation. *State v. McKessor*, 246 Kan. 1, 12, 785 P.2d 1332, *cert. denied* 495 U.S. 937 (1990).

In the second suppression hearing, the court warned Holmes of the dangers of hybrid representation and that generally it was not allowed. However, the court made an exception for that hearing

and allowed counsel to argue Holmes' pro se motion to suppress. The prosecution did not object to the trial court's decision.

The State cites *State v. Ames*, 222 Kan. 88, 98-101, 563 P.2d 1034 (1977), in arguing that the defendant could have represented himself or been represented by counsel, but not both. However, *Ames* does not support the State's assertion. In *Ames*, the trial court allowed the defendant to file a plethora of pro se motions at both pretrial and posttrial hearings and to argue some of those motions; however, the court did not allow Ames to participate at the trial. This court did not criticize the trial court for allowing the defendant to file pro se motions or hear those motions. Rather, we found that the trial court did not abuse its discretion in limiting the defendant's participation in his defense. 222 Kan. at 101. In this case, the trial court allowed Holmes' pro se motion to be argued by counsel. As a result, the State's argument fails.

(b) Failure to object.

The State asserts that this issue was not preserved for review because Holmes only objected to issues outlined in the first motion to suppress and failed to object to the introduction of the evidence at trial. Nevertheless, our review of the issue on its merit is still resolved in the State's favor.

(c) Additional issues and evidence raised in the second motion to suppress.

Holmes argues that the district court erred in refusing to grant an evidentiary hearing on the second motion to suppress because it raised additional issues and evidence not presented in the first motion. Holmes first points to the issue of whether his consent to search was voluntary. The State concedes that the consent to search issue "was not contained in the motion to suppress filed prior to Holmes' first trial," but argues that the issue does not have merit.

However, our review of the record reveals that the consent to search issue was raised in the first motion which asked the court to suppress the physical evidence obtained by the alleged unlawful and unconstitutional search and seizure. The second motion addressed the same issue but in more detail. The consent to search the home issue was raised in the first motion to suppress, litigated in the first suppression hearing, and reiterated in the second mo-

tion to suppress. As such, the trial court in considering the second motion did not err by summarily dismissing the consent to search issue as being previously heard by the court.

Holmes also argues that additional evidence was raised in the second motion to suppress that was not available at the first suppression hearing and, thus, the district court abused its discretion by not granting an evidentiary hearing. Holmes alleges that Schroeder's testimony regarding Holmes' appearance and his ability to articulate in the first suppression hearing and the first trial was inconsistent. The State does not address the additional evidence claims.

"Normally, . . . the motion, when made before trial, will be heard once and disposed of; however, if at trial new or additional evidence is produced bearing on the issue or substantially affecting the credibility of the evidence adduced at the pretrial hearing of the motion, . . . [K.S.A. 22-3216] authorizes reentertainment of the motion in the court's discretion." *Jackson*, 213 Kan. at 226.

Schroeder, in the first suppression hearing, stated that Holmes appeared quiet, tired, seated, subdued, his speech was clear, and he did not display any signs that he was incapacitated. In contrast, at the first trial, Schroeder reiterated these observations but also described Holmes' speech as stuttered and shaky at times. Additionally, with regard to certain statements, Schroeder had the impression that Holmes was unsure of what he was saying.

Holmes argues that he was entitled to an evidentiary hearing based on these inconsistent statements but does not argue how they were material to the issues or substantially affected the credibility of the evidence. In addition, Holmes does not cite any authority to support his position. Holmes merely asserts that the court considering the second motion was unreasonable and arbitrary in refusing to grant an evidentiary hearing. An issue which is not adequately briefed is deemed abandoned. *State v. Brown*, 272 Kan. 843, 844, 35 P.3d 910 (2001).

Moreover, the record shows defense counsel told the court considering the second motion that "[t]he motion to suppress was previously litigated . . . and, again, I think Mr. Holmes in an abundance of caution filed a motion to preserve that issue for appeal." "A litigant may not invite and lead a trial court into error and then

complain of the trial court's action on appeal. [Citation omitted.]" *State v. Boorigie*, 273 Kan. 18, 27, 41 P.3d 764 (2002). The court did not abuse its discretion in overruling the second motion based on defense counsel's statement that the suppression issue in the second motion had been previously litigated.

(3) The trial court abused its discretion in various parts of the trial

"The admission of evidence lies within the sound discretion of the trial court. [Citation omitted.] An appellate court's standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. One who asserts that the court abused its discretion bears the burden of showing such abuse of discretion. [Citation omitted.]" *State v. Jenkins*, 272 Kan. 1366, 1378, 39 P.3d 47 (2002).

In his pro se brief, Holmes argues that the trial court abused its discretion in various parts of the trial by (a) allowing the jury to use the transcript without proper redaction and by denying his pro se motion for discovery (b) for a picture showing that the victim slid down the wall and (c) for information regarding whether Schroeder had a medical reason for a bad memory. The State responds that the transcript was sufficiently redacted and that even if the jury viewed portions of the videotaped interrogation that were not edited correctly, this error was cured by a K.S.A. 60-455 limiting instruction. The State does not address Holmes' discovery arguments.

(a) Redacted Transcript.

Counsel for both sides prepared a transcript of the videotaped interrogation which was played for the jury at trial. Defense counsel filed a motion in limine requesting that Holmes' prior criminal record, prior bad acts, personal history, and activity not directly related to this case be redacted from the videotape and transcript. In the preliminary hearing, the court set aside a portion of the hearing to talk about the redaction of the videotape, the transcript, and the motion in limine. At that time, the prosecutor informed the court that prior to the hearing, both prosecution and defense tediously went through the transcript to agree on what should be

deleted. The prosecutor presented defense counsel with the "full version of everything that's on the video, as well as what we have so far agreed to redact." Defense counsel responded:

"I've seen the videotape, and . . . I think we've probably hit 90 plus percent of it. And we certainly have hit the most actionable parts, and they're contained in what we had of the written transcript. But when I compared that to the video, I think we cleaned it up tremendously. And I think for [the prosecutor] and I to agree to what needs to be redacted, I don't think we have a problem there. And so I'll go through this tonight and just make sure, but, I mean, I'm comfortable with the effort that we have put forth."

On the first day of trial, defense counsel told the judge that he went through the redacted transcript and requested that items or comments such as the purported sale of drugs or sale of drugs also be deleted. An off-the-record discussion was held by the court and counsel at the bench. At that time, both parties agreed on the sections to be edited.

Prior to the viewing of the videotape during trial, the court asked defense counsel if there was any concern as to the transcript itself being admitted. Defense counsel objected to the jury having a copy of the transcript in case something had been left out because he had seen the videotape in its entirety but not the redacted copy of the videotape. The court decided that the jury could use the transcript only if the videotape was inaudible. However, once the videotape was played, the court determined that the jury needed to use the transcript to follow along with the videotape.

Following the videotape being viewed, defense counsel stated to the court:

"Judge, if I may, I'd like to make a record of a conversation that we had back in your waiting area regarding the videotape that was played. Despite our best efforts, there were some parts of the tape that were not edited correctly as [the prosecutor] and I had agreed to. And I do not want to direct attention to it, but that was the reason why I objected to it being admitted without watching it. The Court informed us that [it] would not play the videotape or . . . give a copy of the transcript to the jury without playing [the videotape] in the courtroom if [the jury] requested that. . . . [I]t was my understanding in our conversation that we would have the opportunity to redact or edit any portion that would be presented to [the jury] so that it conformed with the Court's previous order. And, also, as a result of the videotape, we are requesting . . . the [K.S.A. 60-455] other crimes evidence PIK instruction."

Both parties and the court agreed to issuing the K.S.A. 60-455 limiting jury instruction. The redacted transcript was not admitted as evidence, and the transcripts were collected from the jury members. Additionally, the redacted videotape was not allowed to go with the jury for its deliberations.

Holmes contends that his due process rights were violated when the court knowingly allowed the jury to use the transcripts without proper redaction. He alleges the prosecutor told the court that the videotape transcripts had not been edited as agreed upon and the court still allowed the jury to use the transcripts. The State contends that a review of the record indicates that the transcript was sufficiently redacted and any potentially prejudicial material from the videotape was cured by issuing the jury instruction for prior other crimes evidence.

"When reviewing a constitutional challenge to the admission of evidence, the appellate court applies the federal constitutional rule. Under that rule, an error may not be held to be harmless unless the appellate court is willing to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. [Citation omitted.]" *State v. Groschang*, 272 Kan. 652, 671, 36 P.3d 231 (2001).

The major problem in reviewing this issue is that Holmes has failed to include the videotape or the transcript in the record on appeal. Without these items, it is virtually impossible to fully assess Holmes' claims. The appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. See *State v. Decker*, 275 Kan. 502, 507, 66 P.3d 915 (2003). Moreover, review of the evidence in the record does not support Holmes' position.

During the preliminary hearing, defense counsel stated that the transcript was sufficient and at the beginning of trial, defense counsel amended portions that he viewed were incorrect in the transcript. Ultimately, both parties gave their best efforts to sufficiently edit the videotape and the transcript. Additionally, the parties agreed to remedy the portions not edited correctly with a K.S.A. 60-455 limiting instruction. The jury would have been exposed to the videotape with or without the transcript. Using the transcript would not have changed the result of the trial. The trial court did

not abuse its discretion in allowing the jury to use the transcript to comprehend the redacted videotape. Holmes' due process rights were not violated.

(b) and (c) Denial of Discovery.

Holmes contends the trial court abused its discretion in denying his discovery request for a picture showing that Smith had slid down the wall and for information regarding whether Detective Schroeder had a medical reason for a bad memory.

The party asserting the trial court abused its discretion bears the burden of showing such abuse of discretion. *Jenkins,* 272 Kan. at 1378. However, the record on appeal does not support Holmes' claim. The trial court sustained Holmes' pro se motion for discovery, and defense counsel stated he believed that he had everything from the State except for the copy of the videotape in regard to Holmes' pro se motion for discovery. Holmes has not met his burden of showing the district court abused its discretion.

(4) Denial of Holmes' pro se motion alleging ineffective assistance of counsel

Defense counsel filed a motion for new trial on August 19, 2002. See K.S.A. 22-3501. Holmes filed a pro se "Motion to Declare Ineffective Assistance of Counsel, and Act of Preservation" on August 22, 2002. The trial court held a hearing on these posttrial motions, as well as other motions filed by Holmes on September 27, 2002. The parties disputed whether the trial court could rule on the pro se motion for ineffective assistance of counsel. The prosecutor stated:

"I really don't know what to tell the Court to do. Um, at a 60-1507 hearing, the defendant gets a new attorney. So when this issue is raised pre-sentencing, I've tried to pull together some case law about how this works in this procedural [posture] of the case, and I'm not convinced that I have adequately exhausted that.

. . . .

". . . And so I think what the Court has to do is determine whether or not we can proceed today . . . ."

Holmes was afforded the opportunity to speak on his behalf but did not raise any additional arguments for his motion. The court, nevertheless, decided to rule on the motion. The trial judge stated:

"Well, I think that the Court is in a position that I can effectively rule on the Motion to Declare Ineffective Assistance of Counsel, and Act of Preservation.

"First, I'm going to—after considering all the arguments and the statements made in this motion, the motion itself is without merit and it is overruled."

The defendant represented himself for the remaining motions, except for the motion for new trial and the "Motion Implementing Disciplinary Action." The trial court set the latter two motions for a later hearing to allow defense counsel to withdraw from the case and for new counsel to be appointed.

Newly appointed defense counsel filed a supplemental motion for new trial on October 21, 2002, which incorporated the ineffective assistance of counsel claims raised in Holmes' earlier pro se motion. On November 7, 2002, the trial court heard the remaining motions pending from the previous hearing. To make the record clear, the prosecutor reviewed the motions that the court had previously ruled upon: however, the prosecutor mistakenly indicated that the motion for ineffective assistance of counsel and act of preservation was still pending. The court again overruled the motion, finding that there was no basis for Holmes' arguments after reviewing the pleadings filed. After the ruling, Holmes alerted the court that it had previously made the same ruling on the motion.

Following that ruling, the trial court entertained the motion for new trial and the supplemental motion for new trial. Defense counsel was given the opportunity to argue those motions. However, defense counsel did not raise additional arguments specific to ineffective assistance of counsel or request that an evidentiary hearing be held. The trial court overruled the motion for new trial, stating that the evidence was admitted appropriately and that the State had met its burden of proof.

A preliminary issue arises as the parties characterize the motions differently on appeal. Holmes construes them as K.S.A. 2003 Supp. 60-1507 motions, while the State labels them as pro se criminal (*i.e.*, posttrial) motions. We agree with the State.

Holmes filed his pro se motions within the 10-day time period for motions for new trial but both motions were filed prior to sentencing. Supreme Court Rule 183(c) (2003 Kan. Ct. R. Annot. 213) defines when the 60-1507 remedy can be invoked: "The provisions

of K.S.A. 60-1507 may be invoked only by one in custody claiming the right to be released." K.S.A. 2003 Supp. 60-1507(a) more specifically states:

"A prisoner in custody *under sentence of a court* of general jurisdiction claiming the right to be released upon the ground that the sentence was imposed in violation of the constitution or laws of the United States . . . [or] Kansas, . . . may . . . move the court which imposed the sentence to vacate, set aside or correct the sentence." (Emphasis added.)

These motions are best characterized as posttrial motions rather than 60-1507 motions because sentencing had not been imposed.

Regardless of whether characterized as either 60-1507 or posttrial motions, the fact remains that the court did not provide findings of fact and conclusions of law to assist this court to conduct a meaningful appellate review.

"Motions for new trials, like many 60-1507 motions, may be meritless and, thus, not entitled to evidentiary hearings. However, the district court must tell us what its findings are and why it concluded the motion to be without merit if we are to conduct any sort of meaningful appellate review." *State v. Moncla*, 269 Kan. 61, 65, 4 P.3d 618 (2000).

Nevertheless, we find that remand is unnecessary in this case based upon our firm conclusion that Holmes' argument on this issue is without merit.

When faced with a motion alleging ineffective assistance of counsel, the district court is to make a preliminary examination to determine whether substantial questions of law or fact are raised, and if the findings are in the negative, the court may summarily deny the motion. *State v. Davis*, 271 Kan. 892, Syl. ¶ 1, 26 P.3d 681 (2001). The trial court's actions in summarily denying a motion for a new trial based on ineffective assistance of counsel are reviewed for an abuse of discretion. *State v. Kirby*, 272 Kan. 1170, 1194, 39 P.3d 1 (2002).

Holmes did not identify what further evidence existed outside his pro se motion for ineffective assistance of counsel to necessitate an evidentiary hearing. Instead, he points to three ways that defense counsel failed to perform his duties: (1) Counsel failed to employ a drug expert to explain the effects of drug use, (2) counsel failed to impeach the forensic pathologist's testimony, and (3)

counsel failed to impeach the statements of other witnesses. The State responds that further evidence was unnecessary because: (1) An expert was not needed because there was sufficient testimony on the drug use and (2) the cross-examination of the forensic pathologist was adequate and further bolstered the defendant's defense.

When acting on a motion for a new trial, our court has held that the procedure "is comparable to the procedure for a K.S.A. 60-1507 motion." *Moncla*, 269 Kan. at 64. When acting on a 60-1507 motion, the court may determine that potential issues of fact are raised in the motion, supported by the files and record, and hold a preliminary hearing to determine if the issues in the motion are substantial. *Gaudina v. State*, 278 Kan. 103, Syl. ¶ 4, 92 P.3d 574 (2004). It is erroneous to deny a 60-1507 motion without an evidentiary hearing where the motion alleges facts which do not appear in the original record, which if true would entitle the movant to relief, and it identifies readily available witnesses whose testimony would support such facts or other sources of evidence. *Floyd v. State*, 208 Kan. 874, Syl. ¶ 1, 495 P.2d 92 (1972). The motion must set forth a factual background, names of witnesses, or other sources of evidence demonstrating movant's entitlement to relief. *Sullivan v. State*, 222 Kan. 222, 223-24, 564 P.2d 455 (1977).

In his pro se motion, Holmes first contends that defense counsel failed to hire an expert in the drug field, that this failure to conduct an appropriate investigation was prima facie evidence of ineffective assistance of counsel, and as a result that an evidentiary hearing was warranted. He did not identify an expert witness that would have consulted on the case; rather, he simply alleged an expert witness would have explained that high drug usage can result in paranoid suspiciousness.

Holmes bears the burden of demonstrating that trial counsel's alleged deficiencies were not the result of strategy. See *Ferguson v. State*, 276 Kan. 428, 446, 78 P.3d 40 (2003). The failure to present expert testimony resulting from reasonable trial strategy does not constitute deficient assistance for purposes of claim of ineffective assistance of counsel. See 276 Kan. at 446-49. "[T]he trial court, which observed counsel's performance and was aware of the

trial strategy involved, is in a much better position to consider counsel's competence than an appellate court . . . and should be the first to make a determination of such an issue . . . ." *State v. Van Cleave*, 239 Kan. 117, 119, 716 P.2d 580 (1986).

A review of the record establishes that sufficient evidence of the substantial effects of drug use was placed before the jury through testimony from Smith's daughter, the crime scene investigator, the forensic pathologist, and Holmes. In fact, defense counsel addressed the effects of cocaine during his cross-examination with the forensic pathologist, such as paranoia and heightened awareness. Consequently, "expert" testimony regarding the effects of cocaine was presented to the jury. Holmes has not demonstrated that defense counsel's alleged deficiencies were not the result of strategy.

Holmes next argues that his counsel failed to impeach the forensic pathologist for inconsistent statements made in the first trial regarding the extent of rigor mortis on Smith's body and that this impeachment was necessary to support his time line of events. In the first trial, the forensic pathologist testified that rigor mortis was present only in the face and finger tips; while in the second trial, the pathologist testified that some rigor mortis was present in Smith's lower extremities. The State concedes that counsel failed in this instance; however, it contends sufficient evidence was presented to corroborate Holmes' version of events.

Defense counsel cross-examined the forensic pathologist's time of testing of Smith's body for rigor mortis. The pathologist stated that she had tested for rigor mortis at around 7:30 a.m. and that Smith appeared to have been dead for 2 hours. This information indicates that Smith's death occurred around 5:30 a.m., corroborating Holmes' time line of events. Holmes failed to provide evidence that defense counsel's failure to question the inconsistent statements regarding the extent of rigor mortis impeded his version of events.

Finally, Holmes argued defense counsel failed to impeach Campbell's inconsistent statements regarding the time of the shooting and Schroeder's testimony regarding the location of the gun holster and Holmes' demeanor during the interrogation. How-

ever, defense counsel did cross-examine Campbell on this issue as just discussed and the failure to impeach Schroeder was cured since the crime scene photographs showing where the holster was located and the redacted videotape showing the interrogation were introduced at trial.

The above analyses illustrate that no substantial questions of law or facts were raised. The district court did not err in summarily denying the motion for new trial based upon Holmes' pro se motion for ineffective assistance of counsel without an evidentiary hearing.

## (5) Insufficient evidence to establish premeditation

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Beach*, 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 (2003).

Holmes first argues he was not capable of forming the necessary state of mind to premeditate a murder due to his drug intoxication. Second, he asserts that the shooting was accidental, pointing to the malfunctioning gun to support his position. Third, Holmes reasons that if he intended to kill the victim, he was afforded the opportunity with the hammer blow and since no serious injury resulted at that time, the subsequent shooting was accidental. He asserts a rational jury could not have found him guilty of first-degree murder because these three circumstances raise a reasonable doubt about his guilt. The State disputes Homes' reasons and asserts that the evidence was sufficient to establish premeditated murder. The State points to evidence showing that Holmes fired a single shot to Smith's heart at pointblank range without provocation and then chose to finish his remaining drugs despite Smith's need for medical assistance.

Holmes cites *State v. Ludlow*, 256 Kan. 139, 147, 883 P.2d 1144 (1994), in arguing that his drug intoxication was so severe it caused him to hallucinate and, thus, he was incapable of forming the requisite state of mind. However, the *Ludlow* court held there was sufficient evidence to support the jury's finding that the defendant

was capable of forming the requisite premeditation because he showed no outward signs of physical or mental impairment, appeared stable, and had the presence of mind to drive the victim's automobile to the airport, purchase airline tickets using a false name, and board the airplane. Additionally, the court found that even if the defendant experienced memory loss, it would not mean that the defendant was incapable of forming premeditation. 256 Kan. at 147-48.

In this case, Holmes testified that he believed Smith was dead and made the choice to finish his remaining drugs that he had in his pocket. As a result, Holmes had a seizure after the drug intake. Despite the drug-induced seizure, Holmes was able to call 911 and tell them that he had shot his girlfriend. Neither Officers Bachman nor Easter noticed that Holmes exhibited any signs of impairment during their first encounter with him. Holmes showed no outward signs of mental impairment, he suffered no memory loss, and he was able to testify in detail regarding the events before and after the shooting. Moreover, he was able to explain the reasoning behind his actions at that time. Using the *Ludlow* factors, Holmes was capable of forming the requisite premeditation. See 256 Kan. at 147-51.

Premeditation is a state of mind and may be inferred from the established circumstances of the case, provided the inference is a reasonable one. In such a case, the jury has the right to make the inference. *State v. Parker*, 273 Kan. 56, 63, 41 P.3d 789 (2002). A conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Davis*, 275 Kan. 107, 118, 61 P.3d 701 (2003).

Additionally, application of the following authority leads to the same conclusion. See *State v. Scott*, 271 Kan. 103, 108, 21 P.3d 516, *cert. denied* 534 U.S. 1047; *State v. Decker*, 275 Kan. 502, Syl. ¶ 5, 66 P.3d 915 (2003). Premeditation does not necessarily mean that an act is planned, contrived, or schemed beforehand; rather, that premeditation indicates a time of reflection or deliberation. *Scott*, 271 Kan. at 108. Premeditation may be inferred by the jury from various circumstances, including (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct be-

fore and after the killing, (4) threats and declarations of the defendant before and during the occurrence, or (5) the dealing of lethal blows after the deceased was felled and rendered helpless. *Decker*, 275 Kan. 502, Syl. ¶ 5.

Applying *Decker* to this case, the primary weapon utilized in this case was a gun. The firearms examiner testified that the bullets found in the gun were not specifically manufactured for the gun. When the gun did not have ammunition, pulling the trigger would result in a click but no advancement. The examiner found that one of the bullets had a strike mark indicating that the weapon did not rotate; however, the gun fired properly when the examiner tested the gun with the same type of bullet which killed the victim.

Holmes argues that the defect found in the weapon supports his argument that he heard the gun click and was not sure if the gun was loaded; thus, the shooting was accidental. He contends this evidence raises doubt about his guilt in the mind of a rational jury. However, Holmes' own testimony demonstrates that he thought the gun was unsafe. He testified that

"[a]fter the third click . . . it wasn't in my mind that it was gonna go off. But I didn't—I didn't know if it had one bullet in it or what was going on. But I was just thinkin', for some reason, that she was still trying—and I did that, so I was really thinkin' that she could hurt me."

Although the gun might have been malfunctioning, Holmes' prior experience in the military and his testimony support the belief that he considered the gun to be harmful.

Premeditation can also be inferred by lack of provocation. *State v. Sanchez-Cazares*, 276 Kan. 451, 459, 78 P.3d 55 (2004). After Smith warned Holmes that she had a gun, the two struggled. Eventually, Holmes pinned Smith to the floor and pointed the gun at her. By the time the gun fired, Holmes had control of the gun and of Smith. No provocation existed.

Holmes' conduct before and after the killing can also be used to infer premeditation. See *State v. Boone*, 277 Kan. 208, 222, 83 P.3d 195 (2004). Prior to the shooting, Holmes struck the victim in the head with a hammer. Holmes claimed that if he intended to kill the victim, his hammer blow would have been fatal and since she

was not seriously injured, her death resulted from an accidental shooting caused by the struggle for the gun. Even if this court were to conclude that his conduct before the killing did not infer premeditation, his conduct after the killing supports the jury verdict. After he shot Smith, Holmes saw that she had stopped moving and blood was bubbling out of her mouth. Instead of providing immediate aid, Holmes finished the remaining drugs in his possession. He had a drug-induced seizure and only after he recovered did he contact 911. The time is disputed; Holmes believed that the time was 6 to 7 minutes, where the State contends it was 2 hours. However, the serious nature of the injury necessitated immediate medical attention which Holmes did not provide.

Premeditation can also be inferred from threats and declarations made by Holmes before and during the occurrence. See *Decker,* 275 Kan. 502, Syl. ¶ 5. Holmes threatened Smith that he "could" or "would" kill her after Smith was on the ground. He testified that he was not trying to say "I'm going to kill you" but was "trying to make her stop fightin' me over [the gun]." Holmes also testified that Smith's hands were still on the gun, "[b]ut I had more control over the gun than she had." Plus, he testified that he had straddled her and pinned her to the floor with one knee. Holmes' statements can be considered threats since he had control over the gun and Smith.

The dealing of lethal blows after the deceased was felled and rendered helpless is another circumstance for a jury to infer premeditation. *Decker,* 275 Kan. 502, Syl. ¶ 5. No evidence of such further lethal blows was presented. Nevertheless, the other four circumstances demonstrate that premeditation was established by sufficient evidence. A rational jury could have found Holmes guilty of first-degree murder beyond a reasonable doubt.

(6) Instruction to limit the effect of sympathy and prejudice

"In a criminal action, a trial court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When considering the refusal of the trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction. [Citation omitted.]" *State v. Gholston,* 272 Kan. 601, 615, 35 P.3d 868 (2001), *cert. denied* 536 U.S. 963 (2002).

Holmes argues that the district court erred in refusing to instruct the jury that it should set aside sympathy and prejudice in deciding the matter. See PIK Crim. 3d 51.07. He reasons the instruction was necessary to ensure a fair trial because one or two of Smith's family members began crying and were escorted out of the courtroom and as a result that the jury was influenced by that observation.

The State relies on an earlier version of the PIK instruction in arguing that the Notes on Use section recommends that the instruction not be given in the absence of "very unusual circumstances." See PIK Crim. 2d 51.07 (1994 Supp.). The district court utilized this standard as well and refused to give an instruction. However, no Notes on Use follow PIK Crim. 3d 51.07, which was applicable to this case. Instead, the PIK instruction states that the instruction which originally appeared has been deleted because it was disapproved for general use, citing *State v. Harmon*, 254 Kan. 87, 865 P.2d 1011 (1993); *State v. Reser*, 244 Kan. 306, 767 P.2d 1277 (1989); *State v. Sully*, 219 Kan. 222, 547 P.2d 344 (1976); and *State v. Maggard*, 26 Kan. App. 2d 888, 995 P.2d 916 (2000). The State's reliance on PIK Crim. 2d 51.07 and *Reser* is thus unpersuasive.

The committee on pattern jury instructions and the defendant cite *State v. Rhone*, 219 Kan. 542, 548 P.2d 752 (1976), as an example of when the instruction should be approved. In *Rhone*, the State's key witness was ill from cancer and unable to testify on the stand. The parties and jury were taken to the witness' residence to hear the witness' testimony. As a result, the trial court gave the instruction to the effect that neither prejudice nor sympathy should be allowed to influence the verdict, in substantial accord with that stated in PIK Crim. 2d 51.07.

The committee on pattern jury instructions only provides the *Rhone* circumstance as guidance on when the trial judge should instruct PIK Crim. 3d 51.07. Holmes' situation does not compare to the situation in *Rhone*. In *Rhone*, the jury was at the witness' residence, not in the courtroom, and the situation lasted as long as her testimony. In Holmes' case, the incidents took place in the courtroom, and the incidents were brief since the family members

were escorted from the courtroom after they started crying. In the light most favorable to Holmes, circumstances in this case did not warrant the instruction be given to the jury.

(7) Hard 40 sentence

The district court imposed a hard 40 sentence pursuant to K.S.A. 2003 Supp. 21-4638, after finding that "this murder was committed in a particularly heinous manner, wicked and vial, and for purposes of obtaining benefit or economic relief on behalf of the defendant." See K.S.A. 2003 Supp. 21-4636(c) and (f). Holmes argues the evidence was insufficient to support either of those aggravating circumstances. We agree.

Where the sufficiency of the evidence for establishing an aggravating circumstance under K.S.A. 2003 Supp. 21-4636 is challenged, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the State, a rational factfinder could have found by a preponderance of the evidence the existence of the aggravating circumstance. *State v. Papen*, 274 Kan. 149, 163, 50 P.3d 37 (2002).

Holmes first argues that the evidence was insufficient to support the existence of the aggravating circumstance of committing a crime for economic benefit. K.S.A. 2003 Supp. 21-4636(c) specifically provides: "The defendant committed the crime for the defendant's self or another for the purpose of receiving money or any other thing of monetary value."

In resolving this issue, guidance can be gained from the following cases where this court has found evidence sufficient to uphold the aggravated circumstance listed in K.S.A. 2003 Supp. 21-4636(c). See *State v. Boldridge*, 274 Kan. 795, 809-10, 57 P.3d 8 (2002) (Boldridge aided the shooting of her former husband in order for her son to receive his social security death benefits); *State v. Flournoy*, 272 Kan. 784, 791-92, 36 P.3d 273 (2001) (defendant would be the executor of the victim's estate if exonerated for shooting his grandmother); *State v. Murillo*, 269 Kan. at 281, 289, 7 P.3d 264 (2000) (Murillo committed murder while attempting to find cocaine); *State v. Vontress*, 266 Kan. 248, 249, 970 P.2d 42 (1998) (Vontress and another man went to the victim's house "looking for

drugs and money"); *State v. Kingsley*, 252 Kan. 761, 789-90, 851 P.2d 370 (1993) (Kingsley went to the victim's house with the intention of killing her and taking her money and valuables).

Comparison of these cases to the present case reveals that the State did not present sufficient evidence to establish the claim that Holmes killed the victim in order to obtain her property. Unlike *Boldridge,* Holmes was not named a beneficiary to Smith's will or life insurance policy. Similarly, no evidence was presented Holmes had any rights to Smith's property, as was the case in *Flournoy*, nor that he took or intended to take any of Smith's jewelry or money, as in *Kingsley.*

The State's theory that Holmes finished off his remaining drugs to relieve himself of the burden of purchasing or sacrificing any other belongings or money to obtain additional drugs is also flawed. In *Murillo*, there was sparse evidence that Murillo was looking for cocaine when he murdered the victim. The *Murillo* court found that the defendant killed the victim while in the process of locating his cocaine; while the evidence was not overwhelming, it was sufficient to establish the aggravating factor by a preponderance of the evidence. 269 Kan. at 289.

Unlike *Murillo*, Holmes and Smith struggled over control of the gun, not over control of his drugs. Indeed, Holmes and Smith argued over his lack of property and a job because of his drug purchases, and they both had taken large amounts of drugs earlier that day. However, they both owned their own drugs. Prior to the shooting, Smith had purchased her own drugs that night and injected them while in the bathroom and Holmes had taken his own drugs while in the bedroom prior to their argument. The State did not present evidence that Smith wanted to have Holmes' drugs prior to the shooting. Instead, the evidence indicated that Smith wanted Holmes to "get more money and go back to work." Accordingly, we conclude that this aggravated circumstance was not established by a preponderance of the evidence.

Holmes also argues that insufficient evidence was presented to support the State's second aggravating circumstance. We agree. K.S.A. 2003 Supp. 21-4636(f) identifies committing a crime "in an especially heinous, atrocious or cruel manner" as another aggra-

vating circumstance and subsections (f)(1) through (f)(7) of 21-4636 list seven types of conduct that are considered sufficient to fall under this aggravating circumstance.

The State does not cite any of the seven types of conduct listed in K.S.A. 2003 Supp. 21-4636(f) to support this aggravating circumstance but does point to evidence that Holmes threatened that he "could" or "would" kill Smith before firing the fatal shot. K.S.A. 2003 Supp. 21-4636(f)(1) provides that prior criminal threats to the victim are sufficient to find that the crime was committed in an especially heinous, atrocious, or cruel manner. The State also argues that the fact that Holmes struck Smith on the back of her head with a hammer prior to the shooting supports this aggravating circumstance. K.S.A. 2003 Supp. 21-4636(f)(3) provides that infliction of physical abuse before a victim's death is sufficient for this aggravating circumstance. Additionally, K.S.A. 2003 Supp. 21-4636(f)(5) states that continuous acts of violence begun before a killing would also rise to such a level.

Regarding K.S.A. 2003 Supp. 21-4636(f), this court has held:

" 'All murders are heinous, atrocious, and cruel.' *State v. Cook*, 259 Kan. 370, 403, 913 P.2d 97 (1996). 'However, exceptional circumstances must exist before a murder can be classified as "especially heinous, atrocious or cruel." ' " *State v. Spry*, 266 Kan. 523, 531, 973 P.2d 783 (1999). " 'The hard 40 sentence should be reserved for special cases . . . . Otherwise, the legislature would have mandated the hard 40 sentence in all first-degree murder cases.' " 266 Kan. at 531 (quoting *State v. Willis*, 254 Kan. 119, 129, 864 P.2d 1198 [1993])." *State v. Sanders*, 272 Kan. 445, 462-63, 33 P.3d 596 (2001), *cert. denied* 536 U.S. 963 (2002).

Accordingly, shooting deaths are not generally considered to rise to the level of being especially heinous, atrocious, or cruel. *State v. Conley*, 270 Kan. 18, 28, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001).

However, this court has recognized an exception to the general rule in *State v. Alford*, 257 Kan. 830, 838, 896 P.2d 1059 (1995). Alford chased the victim into the lobby of the restaurant, shot her twice, and forced her back into the kitchen. When she attempted to escape, he shot her again, dragged her around the corner of the kitchen, and fired the final two shots. Based on these facts, this court concluded that the murders were committed in an especially

heinous, atrocious, or cruel manner. 257 Kan. at 838. See also *State v. Brady*, 261 Kan. 109, 123-24, 929 P.2d 132 (1996) (both victims were forced to lie face down on the floor while the defendant paced around their bodies for 15 minutes before shooting them).

In *Flournoy*, 272 Kan. at 791-94, this court examined the above cases and found that the distinguishing factors that allowed the exception to the rule were that the assailant chased the victim or that the assailant forced the victim to lie on the floor awaiting death. In addition, *Flournoy* considered the time element of the shooting relevant. Without those factors, a murder cannot be found to be committed in an especially heinous, atrocious, or cruel manner. 272 Kan. at 794. The *Flournoy* court distinguished its case from *Brady* because the shooting took place in 1 minute and the victim was not chased or forced to lie on the floor awaiting death; thus, the evidence did not support a finding that the murder was committed in an especially heinous, atrocious, or cruel manner. 272 Kan. at 794.

We believe that this case is likewise distinguishable from *Alford* and *Brady*. The facts of this case do not establish a similar situation where the victim was chased or forced to wait in fear of imminent death. Holmes hit Smith with a hammer because she was nagging him—not in an effort to debilitate her so as to then render a fatal blow. Smith introduced the gun into the fight, a struggle ensued, and Holmes' threatening statements were made nearly instantaneously with the shooting.

Even viewing the evidence in the light most favorable to the State, a preponderance of the evidence does not establish that Holmes' conduct rose to the level of an aggravated circumstance under K.S.A. 2003 Supp. 21-4636(f). Rather, this is a shooting death not rising to the level of an especially heinous, atrocious, or cruel manner. We, therefore, vacate the defendant's hard 40 sentence and remand for resentencing in accord with K.S.A. 2003 Supp. 21-4635(c) and K.S.A. 2003 Supp. 22-3717(b).

(8) Prosecutorial Misconduct

A two-step analysis is applied to allegations of prosecutorial misconduct. First, the court decides whether the prosecutor's com-

ments were outside the wide latitude allowed in discussing the evidence. Second, the court must decide whether the comments constitute plain error, that is, whether the statements prejudiced the jury against the defendant and deny him or her a fair trial, thereby requiring reversal. The second step is a particularized harmlessness inquiry for prosecutorial misconduct cases. *State v. Tosh*, 278 Kan. 83, Syl. ¶ 1, 91 P.3d 1204 (2004).

Holmes first argues the prosecutor committed reversible misconduct by making the following statement during closing argument without objection:

"The law. Self-defense is an absolute defense if you buy that he had a belief—that's a subjective test. What's going on in his head? And there must be a reasonable person must think that it is also necessary. *If you buy his self-defense argument, that is an absolute defense. That means you must absolutely find him not guilty of murder at all.* The purpose of self-defense is to defend against an aggressor's imminent use of unlawful force. He is not entitled to self-defense because [the victim] was not the initial aggressor. He was. [The victim] was overpowered, bleeding, and on the ground. Where is his reasonable belief that he is going to suffer deadly harm from her when the gun is pointed at her, not him?" (Emphasis added.)

Holmes contends the prosecutor misstated the law when she equated the term self-defense with being "not guilty of murder" because his "self-defense" was voluntary manslaughter. He points to an element of voluntary manslaughter that he intentionally killed the victim "upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person." The State responds that the prosecutor's argument was an accurate statement of the law pursuant to K.S.A. 21-3211 and *State v. Sims*, 265 Kan. 166, Syl. ¶ 4, 960 P.2d 1271 (1998) (defendant must honestly and sincerely believe it necessary to kill in self-defense and a reasonable person would have perceived the necessity of self-defense). We agree with the State.

The self-defense jury instruction given in this case mirrors the language of K.S.A. 21-3211:

"The defendant has claimed his conduct was justified as self-defense.

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself against such aggressor's imminent use of unlawful force. Such

justification requires both a belief on the part of defendant and the existence of facts that would persuade a reasonable person to that belief."

In accord with this instruction, the prosecutor pointed out that the defendant had to have both a subjective and a *reasonable* belief that self-defense was necessary in order to find that he was not guilty of murder. In contrast, voluntary manslaughter is an intentional killing upon an *unreasonable* belief that self-defense was necessary. K.S.A. 21-3403(b). Viewing the comments in their entirety, the prosecutor was consistent with the law and the instructions given. *Cf. State v. White*, 263 Kan. 283, 306-08, 950 P.2d 1316 (1997).

Based on our conclusion that no prosecutorial misconduct occurred under the first step, further analysis under the second step is unnecessary. See *Tosh*, 278 Kan. at 93 (The second step of the analysis is essentially directed to whether the misconduct is so prejudicial that it denies the defendant a fair trial.).

Holmes additionally argues that the prosecutor did not confine her remarks to the facts in evidence, pointing to the videotape transcripts without proper redaction as evidence. As we have already concluded that the videotape transcripts were sufficiently redacted, this claim fails as well. Holmes was not denied a fair trial and right to due process under the Fourteenth Amendment to the United States Constitution.

## (9) Cumulative effect of errors

" 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' [Citation omitted.]" *State v. Plaskett*, 271 Kan. 995, 1022, 27 P.3d 890 (2001).

Holmes argues that the cumulative trial errors in this case require that his convictions be reversed and his case remanded for a new trial. With the exception of the defendant's sentence, no significant error has been found concerning any of Holmes' issues, and his claim of cumulative errors fails.

Convictions affirmed, sentence vacated, and case remanded with directions for resentencing.